MEMORANDUM OPINION
GRIFFITH, Circuit Judge:
Table of Contents
I. Background.............................................................138
II. Principles of Section 5 Analysis...........................................139
A.Retrogression.......................................................139
1. Texas’s Burden of Proof..........................................140
2. Election Analysis Methodologies..................................141
a. Types of Elections ...........................................141
b. Election Analysis Sample Sets................................143
3. Statewide Retrogression Analysis.................................144
4. Coalition and Crossover Districts .................................147
a. Section 5 Analysis............................................147
b. Standard of Proof............................................149
B.Discriminatory Intent...............................................151
III. Congressional Plan......................................................152
A.Retrogression in the Congressional Plan..............................152
1. Congressional District 27.........................................153
2. Congressional District 23.........................................154
3. Retrogression with New Congressional Seats.......................156
B.Discriminatory Intent in the Congressional Plan.......................159
IV. State Senate Plan .......................................................162
A.Retrogression in the Senate Plan.....................................162
B.Discriminatory Intent in the Senate Plan .............................163
V. State House Plan........................................................166
A.Retrogression in the State House Plan................................166
1. Alleged Retrogressive Districts....................................167
a. State House District 33.......................................167
b. State House District 35.......................................167
c. State House District 41.......................................169
d. State House District 117......................................170
e. State House District 149......................................172
f. State House Districts 26,106, and 144..........................175
2. Alleged New Ability Districts.....................................175
*138 B.Discriminatory Intent in the State House Plan 177
VI. Conclusion....................... 178
The latest Census reports that since 2000 the population of Texas grew by over four million. This dramatic increase required the Texas legislature to create new voting districts for the four seats added to the State’s congressional delegation, U.S. Const, art. I, § 2, cl. 3; id. amend. XIV, § 2, and draw new boundaries for the state and congressional voting districts to comply with the mandate of one-person, one-vote, see Georgia v. Ashcroft, 539 U.S. 461, 488 n. 2, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003).
Because Texas is a covered jurisdiction under section 5 of the Voting Rights Act of 1965(VRA), 42 U.S.C. § 1973, the Attorney General of the United States or a three-judge panel of this Court must approve, or “preclear,” any redistricting plan before it can take effect. Id. § 1973e(a). Texas chose not to seek administrative preclearance and instead seeks from this Court a declaratory judgment that its redistricting plans will neither have “the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [language minority group].” Id. The United States opposes preclearance of the redistricting plans for Texas’s congressional delegation and the State House of Representatives, but has no quarrel with the plan for the Texas Senate. Seven Intervenors raise a variety of challenges that collectively encompass all three plans. We conclude that Texas has failed to show that any of the redistricting plans merits preclearance.[1]
I. Background
On July 19, 2011, Texas filed a complaint in this Court seeking a declaratory judgment that its newly enacted redistricting plans for the U.S. House of Representatives (Plan C185 or Congressional Plan), the Texas House of Representatives (Plan H283 or House Plan), and the Texas Senate (Plan S148 or Senate Plan) comply with section 5 of the VRA. This Court has been properly convened as a three-judge court, 28 U.S.C. § 2284; 42 U.S.C. § 1973c(a), and we took jurisdiction under 42 U.S.C. § 1973c and 28 U.S.C. §§ 1346(a)(2), 2201. After the United States and several Intervenors[2] filed answers, Texas moved for summary judg *139 ment for all three plans on September 14, 2011. We heard argument on the motion on November 2, 2011, and issued an order denying summary judgment on November 8, 2011, 2011 WL 5402888. Our memorandum opinion followed on December 22, 2011.
The same three redistricting plans have been challenged under section 2 of the VRA before a three-judge district court in the Western District of Texas. The State’s population growth and the addition of four seats to its congressional delegation make it impossible for Texas to conduct elections using the district boundaries last approved under section 5. Our denial of Texas’s motion for summary judgment required the district court in the section 2 litigation to draw interim maps for the State’s fast-approaching primaries and the ensuing general election. After the Supreme Court invalidated those maps, see Perry v. Perez, — U.S. -, 132 S.Ct. 934, 181 L.Ed.2d 900 (2012), the court issued a second set, which have not been challenged. See Feb. 28, 2012 Order, Perez v. Perry, No. 11-cv-360 (W.D.Tex. filed May 9, 2011), ECF No. 681 (Congressional Plan interim map); Feb. 28, 2012 Order, Perez, No. 11-cv-360, ECF No. 682 (House Plan interim map); Feb. 28, 2012 Order, Davis v. Perry, No. 5:11-ev-00788 (W.D.Tex. filed May 9, 2011), ECF No. 141 (Senate Plan interim map).
Meanwhile, after expedited discovery, this Court sat for trial January 17-26, 2012, with closing arguments on January 31, 2012.[3] The voluminous trial record includes evidence taken in open court, party exhibits, expert reports, post-trial briefing, and designated portions of the transcript from the section 2 trial in Texas.[4] After reviewing this record and carefully considering the arguments of all parties, we now deny Texas preclearance and enter judgment for the defendants.
In the discussion that follows, we do not recount the extensive background of the Voting Rights Act or of this case. Much of that is contained in our opinion at summary judgment. In addition, we do not repeat many of the factual findings set out in the appendix to this opinion. Using the framework for applying section 5 described in our summary judgment opinion, we first address a series of legal issues that remain outstanding after trial about what section 5 requires for preclearance. Then, we examine the Congressional, Senate, and House Plans in turn.
II. Principles of Section 5 Analysis A. Retrogression
Texas must show that its redistricting plans have neither the effect nor the purpose of abridging minority voting rights. 42 U.S.C. § 1973c(a). We will take up the “purpose” prong below in section B. The goal of the “effect” prong is “to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise,” Beer v. United States, 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), regardless of whether *140 the change was intended to do so. “Effective exercise,” in turn, has long been understood to include not only the “ability of minority groups to participate in the political process,” but also the ability “to elect their choices to office.” Id. (quoting H.R.Rep. No. 94-196, at 60 (1975)). In the most recent reauthorization of the VRA, Congress further reinforced the meaning of the effect prong by stating that minority voters’ “ability to elect” their candidates of choice is the appropriate measure of whether a proposed change will be retrogressive. See 42 U.S.C. § 1973c(b) (stating that section 5 blocks voting changes that diminish minority citizens’ “ability ... to elect their preferred candidates of choice”), id. § 1973c(d) (explaining that the “purpose of subsection (b) ... is to protect the ability of [minority] citizens to elect their preferred candidates of choice”).
As we explained in our summary judgment opinion, ensuring that a proposed plan will not undo the gains minority voters have achieved in electoral power requires a multi-factored, functional analysis. Texas v. United States, 831 F.Supp.2d 244, 262-64 (D.D.C.2011). A single-factor inquiry, such as the test Texas proposed relying on racial and ethnic population statistics alone, is inconsistent with precedent and too limited to provide an accurate picture of the on-the-ground realities of voting power.[5] Id.; see also, e.g., Ashcroft, 539 U.S. at 480, 123 S.Ct. 2498 (“The ability of minority voters to elect a candidate of their choice is important but often complex in practice to determine.”). We do not repeat here the rationale for our conclusion, but instead address the additional arguments raised at trial about the appropriate standard to determine retrogression.
1. Texas’s Burden of Proof
Texas bears the burden of proving by a preponderance of the evidence that its redistricting plans are not retrogressive.[6] City of Pleasant Grove v. United States, 479 U.S. 462, 469, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987). Texas does not deny *141 that it bears this burden. Instead, relying on the Supreme Court’s observation that a state is entitled to select its “own method of complying with the Voting Rights Act,” Bartlett v. Strickland, 556 U.S. 1, 23, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (plurality opinion), Texas claims that “the flexibility to choose one theory of effective representation over the other,” Ashcroft, 539 U.S. at 482, 123 S.Ct. 2498, gives it significant latitude in how to prove its case. Tex. Post-Trial Br. 3.
We agree that section 5 does not interfere with many of the policy judgments a state must make during redistricting, such as whether to retain an ability district — a district in which minority citizens have the ability to elect their preferred candidates — or create a new one elsewhere. Yet Texas takes this point too far, claiming that the prerogative to choose among methods of redistricting extends to the type of evidence we should use to measure retrogression. For example, Texas argues that we must defer to its decision to use the results of statewide elections to measure compliance with section 5. Id. at 5. We disagree. Ashcroft holds that states may choose between “theories] of effective representation,” 539 U.S. at 482, 123 S.Ct. 2498 (emphasis added), but gauging effectiveness is a legal judgment that we must make. Texas is entitled to advocate its preferred methods of measuring minority voting strength, and we address those arguments below, but we need not defer to a state’s legal theory on how best to measure minority voters’ ability to elect. That is a measure at the heart of the preclearance analysis that section 5 has left to the Attorney General or the judiciary.
2. Election Analysis Methodologies
The parties have submitted reports and testimony from fourteen experts in fields such as redistricting, election analysis, voting rights law, and the history of voting discrimination in Texas. Although we do not find the analysis of any one expert sufficient to guide our retrogression inquiry, we rely most heavily on the reports and testimony of Dr. Lisa Handley, expert for the United States; Dr. Richard Engstrom, expert for the Texas Latino Redistricting Task Force (TLRTF); and Dr. Stephen Ansolabehere, expert for the Gonzales Intervenors. We find their methodologies sound and their conclusions helpful to our analysis of the State’s redistricting. To explain our use of these experts we address two areas of disagreement between the parties about the merits of the various approaches the experts use: which type of elections to examine and the appropriate sample sets to use.
a. Types of Elections
Endogenous analysis examines the results of elections held within a district to determine how often minority-preferred candidates succeed.[7] See, e.g., Defs.’ Ex. 326, Dr. Lisa Handley, A Section 5 Voting Rights Analysis of the Proposed Texas State House Plan 3 [hereinafter Handley House Rep.]. Because endogenous analysis is based on actual election results within a single district, it is necessarily retrospective. It can only be used to determine *142 whether a district in the existing, or benchmark, plan has an ability to elect. It cannot be used to assess whether a proposed district does as well, because a proposed district has not yet conducted any district-wide elections.
Exogenous election analysis examines how minority-preferred candidates fared in a particular district in statewide or national elections. See, e.g., Pl.’s Ex. 175, Direct Written Test, of Dr. John Alford 5-6 [hereinafter Alford Rep.]. Take the 2008 presidential election as an example. In a state where minority voters almost always prefer Democratic candidates, exogenous election analysis suggests that minority voters lack an ability to elect in a benchmark district carried by John McCain over Barack Obama. Because exogenous analysis considers results from elections that occur across all districts in a state, such analysis allows comparison between benchmark and proposed districts. Precinct-level data from statewide or national elections can show if the minority-preferred candidate won the benchmark district, and by assembling, or “reconstituting,” the precinct-level returns into a district’s proposed new shape, exogenous election analysis can indicate whether the minority-preferred candidate would have won in the proposed district as well.
Texas urges us to consider exogenous election analysis alone, see Tex. Post-Trial Br. 4-5, but we conclude that endogenous results are often more probative of ability to elect. As Dr. Engstrom explained, exogenous elections are “not a good basis for predicting the specific number of elections in many new districts that will result in Hispanic preferred candidates winning,” partly because there are significant contextual differences between exogenous and endogenous elections. Defs.’ Ex. 747, Rebuttal Report of Dr. Richard Engstrom 6 [hereinafter Engstrom Reb. Rep.]. Likewise, Dr. Handley concluded that “the most essential piece of information” when determining benchmark ability districts “is whether minority voters have been successful at electing their preferred candidates to the legislative office at issue in the district.” Defs.’ Ex. 794, Rebuttal Report of Dr. Lisa Handley to Supplement Expert Report of Dr. John Alford 3 [hereinafter Handley Reb. Rep.]. Candidates in endogenous elections live in a particular district and focus their campaigns on local voters. Candidates in statewide elections are likely to make an appeal with a less direct connection to voters in that district. Nationwide contests are even more attenuated. Local connections and direct campaigning, then, may allow a minority-preferred candidate to win an endogenous election in a district the minority-preferred candidate for statewide office could not carry. We agree with Dr. Engstrom and Dr. Handley. Given the numerous and difficult-to-quantify factors that go into determining ability to elect, the best evidence is whether and how often minority voters have actually elected their candidate of choice to the position at issue, not the indirect proxy offered by exogenous analysis.
Texas argues that endogenous analysis is an “impracticable” tool because it is available only for benchmark plans and does not provide the “common unit of measurement” available with exogenous results. Tex. PosWTrial Br. 4. As we have stated, we agree that endogenous elections are not well suited to prospective analysis, but when predicting the impact of redistricting changes on minority voters’ ability to elect, more information is better than less. We should not discount the powerful evidence of minority voting power that endogenous elections provide in favor of a single tool that may be a less accurate gauge. When endogenous and exogenous analyses yield different results, we will give special attention to other relevant characteristics of the voting district.
*143 Texas argues that endogenous analysis may overvalue minority voting power and undervalue the advantage of incumbency in districts where the minority-preferred candidate has been repeatedly reelected. See id. at 5. We disagree with the premise that an incumbent’s advantage does “not bear on the ability-to-elect inquiry.” Id. The advantage incumbents enjoy during reelection campaigns is a factor that minority voters, like any other voters, often use to help elect their preferred candidate. Ability to elect is not less real simply because subsequent elections are easier to win than the first. Texas raises the more specific objection that endogenous results may be misleading in a district in which ability status is closely contested if a long-term incumbent plans to retire. Id. Yet as our analysis below bears out, our finding that endogenous elections are particularly probative evidence does not mean that a high endogenous score automatically implies ability status. Careful consideration of all factors matters, especially in close cases.
We thus see no reason to exclude all endogenous election data from our analysis, nor to weigh exogenous data more heavily. Both types of data provide information about whether minority voters are or will be able to participate in the political process.
b. Election Analysis Sample Sets
The experts also vary widely in which elections they used for their sample sets. All use a similar methodology for their exogenous analysis. Starting with the boundaries in the benchmark plan, they count the number of times the minority-preferred candidate carried the district. Reconfiguring the districts by regrouping precincts as called for in the enacted plan, their analyses then look to see how many times the minority-preferred candidate would have carried that district. Outcomes are determined by inputs, of course, and whether the analysis shows an ability to elect turns on variations in the sample set such as the number of elections chosen, the length of time they span, whether the sample is weighted toward more recent contests, and the offices at stake. For example, Texas’s expert, Dr. Alford, relies on reconstituted election results from a'set of ten statewide elections weighted toward more recent years provided by the Texas Office of the Attorney General (the OAG 10). See Alford Rep. 9 tbl.2.[8] Texas argues that we should give greatest weight to these exogenous results because they used a larger data set and relied more heavily on recent elections than did any other expert in the case.[9] Tex. Post-Trial Br. 5.
*144 Although we agree that a larger data set generally improves accuracy, we are not persuaded that the OAG 10 is the best indicator of minority voting strength. A preference for recent elections may in fact distort the results. Dr. Handley, the expert for the United States, cautions against giving more weight to some years than others. To do so, she warns, would allow atypical election years to skew the picture of long-term minority voting power. See Handley Reb. Rep. 4 n. 6. This caution is especially appropriate here because three of the OAG 10 elections are from the 2010 election cycle. As the evidence in this case shows, 2010 was an unusual year with low Democratic turnout in which Republicans won several seats that had long been held by Democrats. See, e.g., Defs.’ Ex. 776, Seliger Dep. 15:1— 7, Sept. 1, 2011, Perez, No. ll-cv-360 [hereinafter Seliger San Antonio Dep.] It is too soon to tell if 2010 was an aberration or marked the start of a lasting change in Texas politics.
Our concerns with the OAG 10 extend to the other sample sets used by the parties’ experts. Dr. Engstrom’s exogenous election sample also places greater weight on recent years, considering elections from only 2006-2010. See Defs.’ Ex. 726, Supplemental Expert Report of Dr. Richard Engstrom 2 [hereinafter Engstrom Suppl. Rep.]; Defs.’ Ex. 799, Dr. Richard Engstrom Analysis: Retrogression in State’s Adopted House Plan [hereinafter Engstrom Chart]. And all the experts in this case use relatively small sample sets. Dr. Handley, for example, uses only five elections from 2002-2010, and Dr. Engstrom uses just seven general elections. Handley House Rep. 3-4; Engstrom Suppl. Rep. 2; Engstrom Chart. Where there are so many elections from which to choose — the record contains analysis using races ranging from governor to railroad commissioner — it is hard to assess the merits of any one expert’s data when the sample sets are small and often do not overlap. In short, we are uncomfortable relying exclusively on the exogenous analysis of any single expert. Our solution is to consider the exogenous results from all three of these sources — the OAG 10, Dr. Handley, and Dr. Engstrom — as well as the analysis for the Congressional Plan conducted by Dr. Stephen Ansolabehere, the expert for the Gonzales Intervenors, finding all to be probative but none dispositive.
3. Statewide Retrogression Analysis
As the Supreme Court has made clear, our analysis of minority voting power “must encompass the entire statewide plan as a whole.” Ashcroft, 539 U.S. at 479, 123 S.Ct. 2498. Section 5 is not concerned with the location of particular ability districts, but rather with whether the enacted plan, in its entirety, preserves minority voters’ ability to elect. In other words, section 5 allows a state to dismantle an ability district as long as it offsets that loss by drawing a new ability district elsewhere.
But Texas asks us to expand this principle to a point that is inconsistent with section 5. Texas’s expert submitted two reports to the Court, one at summary judgment and another at trial. His first report counted any district in which the number of registered Hispanic voters exceeded 50% or the Black Voting Age Population (BVAP) exceeded 40% as an ability district, without giving attention to actual election performance. See Texas, 831 F.Supp.2d at 263 n. 23. After we rejected this single-factor test, Dr. Alford changed tack in his trial report, which uses what he calls a “statewide functional analysis.” See Alford Rep. 7. Rather than determine if particular districts are ability districts, Dr. Alford’s latest approach examines changes in the degree of minority voting power across the entire plan. Using the bench *145 mark ability districts the United States listed, Dr. Alford counted every instance in which a minority-preferred candidate carried the district in an exogenous election. He then counted how many times the minority-preferred candidate would have carried the district in the enacted plan. If the total number of “wins” in the enacted plan meets or exceeds the number in the benchmark, Dr. Alford concludes that the plan is not retrogressive. See id. at 7-12. Dr. Alford contrasts his statewide approach to what he calls the “binary” approach of every other expert in the case. Those experts examine each district individually, using exogenous results as one factor when determining if a district is an ability district. See id. at 12-13. They then compare the number of ability districts in the benchmark map with the number in the proposed plan. Dr. Alford’s method counts election victories across all districts and does not label a district as “ability” or not. Texas argues this approach is superior to the “blunt technique” of the binary method because it “captures the degree of minority voting strength across all relevant districts.” Tex. Post-Trial Br. 6.
Perhaps, but this approach is a variation on the type of retrogression analysis that Congress rejected when it amended the VRA in 2006. In Georgia v. Ashcroft, 539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003), the Supreme Court concluded that courts “should not focus solely on the comparative ability of a minority group to elect a candidate of its choice,” but instead should consider the “totality of the circumstances” regarding minority participation in the electoral process. Id. at 479-80,123 S.Ct. 2498. Specifically, the Court concluded that states could draw maps containing a combination of two different types of districts to satisfy section 5: traditional majority-minority districts, and “influence districts,” which are not ability districts, but rather those in which minority voters play a “substantial, if not decisive, role in the electoral process.” Id. at 480-83,123 S.Ct. 2498.
Congress rejected this holding in 2006 when it reauthorized section 5, making it clear that retrogression is not concerned with the degree of influence minority voters exert, but with their ability to elect their preferred candidates. See 42 U.S.C. § 1973e(b) (stating that voting changes must not diminish minority citizens’ “ability ... to elect their preferred candidates of choice”), id. § 1973c(d) (defining subsection (b)’s purpose as protecting “the ability of [minority] citizens to elect their preferred candidates of choice”). The House Report explained that the 2006 amendments were a response to Georgia v. Ashcroft, which allowed “the minority community’s own choice of preferred candidates to be trumped by political deals struck by State legislators purporting to give ‘influence’ to the minority community while removing that community’s ability to elect candidates.” H.R.Rep. No. 109-478, at 69 (2006), 2006 U.S.C.C.A.N. 618, 670. Congress decided that “[permitting these trade-offs is inconsistent with the original and current purpose of Section 5.” Id.; see also id. at 68-72; S.Rep. No. 109-295, at 18-20 (2006) (stating that the amendments “clarify that [section 5] protects the ability of minority voters ‘to elect their preferred candidates of choice,’ ” id. at 19). Congress does not view “ability to elect” in degrees; states may not add up districts in which minority voters have “partial” ability to elect to satisfy section 5. Instead, Congress views ability status as an on-off switch: minority voters either have an ability to elect in a district or they do not.
Endorsing Dr. Alford’s analysis would be a return to the approach Congress rejected in 2006. Consider, for example, a benchmark map with three districts. In two of the districts, minority voters elect *146 their preferred candidates in six out of ten elections in a sample set, but in the third, they fail to win a single election. In all three districts in the enacted plan, minority-preferred candidates win in four out of the ten elections. A traditional binary approach would likely conclude that the benchmark map has two ability districts (where minority voters can elect their candidate of choice more often than not), and the enacted plan has no ability districts, just three influence districts. Such a plan would be clearly retrogressive under the current version of section 5. Yet Dr. Alford’s approach would show no retrogression because the total number of minority electoral victories remains the same (6 + 6 + 0 = 12 in the benchmark; 4 + 4 + 4 = 12 in the enacted).
Texas argues that Dr. Alford’s approach yields better policy results, but such determinations belong to Congress, not the courts. In any event, the “benefits” Texas touts are illusory. Texas argues that the binary approach “ignores gradations in minority abilities to elect and gives States no credit for improving electoral performance in districts that stay above or below the ability-to-elect cutoff.” Tex. Post-Trial Br. 6.[10] In other words, Texas seeks credit for strengthening an already-performing district from, say, six out of ten victories to ten out of ten. Yet giving credit in a scenario like this would allow Texas to use those four “additional” victories to offset a four-election decrease elsewhere. Such an approach would create a legal tool to dismantle ability districts as long as the state increases the effectiveness of others. In short, it would give states credit for packing minority voters into districts. A starker example would be a plan in which six benchmark districts perform for minority voters nine out of ten times, but perform ten out of ten times in the enacted plan. Statewide functional analysis would allow a state to use this six-election “increase” in minority effectiveness to weaken or even destroy ability districts in other parts of the state.
We also find it significant that Dr. Alford can point to no other advocates of his approach within the well-populated field of voting rights and redistricting. Statewide functional analysis is not only foreclosed by the 2006 amendments, but it lies outside accepted academic norms among redistricting experts. See, e.g., Engstrom Reb. Rep. 2-6 (critiquing Dr. Alford’s approach and noting he was “not aware of any analysis, prior to this one by Dr. Alford, by any expert that completely ignores the results of endogenous elections in a benchmark plan in a retrogression analysis,” id. at 2); Handley Reb. Rep. 2-6 (critiquing Dr. Alford’s approach).
Moreover, statewide functional analysis would be much more difficult to administer than the already fact-intensive binary approach because courts would need to make even more precise findings than whether a district is or is not an ability district. Courts would need to determine, for example, the difference between districts with effectiveness levels of 60% and 70%. Dr. Alford claims he can make these fine distinctions based on a district’s electoral performance in the limited set of elections that he chose. Yet as the multitude of experts in this case demonstrates, there is no agreed-upon method to choose how many elections are necessary to demonstrate voting strength, much less which elections and over how long a period of *147 time. We lack confidence that we, or any court, would be able to make findings at the level of precision Dr. Alford’s approach requires.
Finally, we reject Texas’s argument that refusing to accept statewide functional analysis would increase the “substantial federalism costs” of preclearance by further limiting state flexibility, at the risk of rendering section 5 unconstitutional.[11] See Tex. Post-Trial Br. 7 (quoting Reno v. Bossier Parish Sch. Bd. (Bossier II), 528 U.S. 320, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000)) (internal quotation marks omitted). The constitutional avoidance canon is no aid to Texas because we are not faced with two competing yet permissible interpretations of section 5. See United States v. X-Citement Video, Inc., 513 U.S. 64, 69, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (describing the interpretative presumption “that a statute is to be construed where fairly possible so as to avoid substantial constitutional questions” (emphasis added)). As we have just discussed, retrogression analysis under section 5 as amended limits our analysis to ability to elect and does not permit us to weigh degrees of effectiveness. We cannot adopt an interpretation at odds with the statutory text to avoid possible constitutional concerns.
4. Coalition and Crossover Districts
a. Section 5 Analysis
In a crossover district, a minority group “is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority’s preferred candidate.” Bartlett, 556 U.S. at 13, 129 S.Ct. 1231. In a coalition district, two or more minority groups work together to elect their preferred candidate. Id. We held at summary judgment that because existing “coalition and crossover districts provide minority groups the ability to elect a preferred candidate, they must be recognized as ability districts in a Section 5 analysis of a benchmark plan.” Texas, 831 F.Supp.2d at 267-68. Texas asks us to reconsider our ruling in light of Bartlett v. Strickland, 556 U.S. 1, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (plurality opinion), and the Supreme Court’s recent decision in Perry v. Perez, — U.S. -, 132 S.Ct. 934, 181 L.Ed.2d 900 (2012). Having considered the parties’ arguments, we reaffirm our conclusion that coalition and crossover districts are protected under section 5.
The Supreme Court has never directly addressed whether section 5 protects coalition or crossover districts. A close reading of Georgia v. Ashcroft, however, suggests that it does. The Court described districts with “coalitions of voters who together will help to achieve the electoral aspirations of the minority group,” 539 U.S. at 481, 123 S.Ct. 2498, concluding that such districts count as “effective representation” for purposes of section 5, just like “safe majority-minority districts.” Id. at 480-82, 123 S.Ct. 2498 (“Section 5 gives States the flexibility to choose one theory of effective representation over the other.” Id. at 482, 123 S.Ct. 2498.).[12] The Court’s *148 statements in Georgia v. Ashcroft are reinforced by the House Report accompanying the 2006 amendments, which spoke of coalition districts as a type of ability district: “Voting changes that leave a minority group less able to elect a preferred candidate of choice, either directly or when coalesced with other voters, cannot be precleared under Section 5.” H.R.Rep. No. 109-478, at 71, 2006 U.S.C.C.A.N. 618, 672 (emphasis added).[13]
In addition, the Court’s jurisprudence under section 2, a distinct yet related provision of the VRA mandating equal opportunity for minority voters to participate in the electoral process, supports protecting coalition and crossover districts under section 5. The Court has long acknowledged the existence of coalition and crossover districts, recognizing at times that they can provide the means for minority voters to elect their candidates of choice. See Johnson v. De Grandy, 512 U.S. 997, 1020, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (describing “communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice ” (emphasis added)); Voinovich v. Quitter, 507 U.S. 146, 154, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (describing a district in which a minority group was not large enough to elect its preferred candidate operating alone but could do so if it “attract[ed] sufficient cross-over votes from white voters”).[14] In fact, the Court has suggested that such districts will become more common over time, replacing majority-minority districts as waning racial polarization makes it easier for minority voters to elect their preferred candidates even when they do not make up the majority of a district’s voters. See De Grandy, 512 U.S. at 1019-20, 114 S.Ct. 2647. In other words, “ability” may look different now than it did when the VRA was first enacted. Our responsibility to protect the rights secured by section 5 calls that we be sensitive to these new, but real, forms of minority voting power.
Texas argues that the Court’s decision in Bartlett precludes recognizing coalition and crossover districts under section 5. See Tex. Post-Trial Br. 8. But the Bartlett Court only concluded that section 2 does not compel states to draw new crossover districts under section 2, not that states can disregard the existence of established crossover and coalition districts in a section 5 inquiry.[15] See Texas, 831 F.Supp.2d at 267-68. Significantly, Bartlett noted that it did not reach the question of whether states could choose to draw crossover districts “as a matter of legislative choice *149 or discretion,” and cited Georgia v. Ashcroft to show that drawing such districts may be the most effective way to strengthen minority voting power. Bartlett, 556 U.S. at 23, 129 S.Ct. 1231. Far from revealing skepticism or hostility toward coalition districts, this language suggests that such districts can increase minority voters’ electoral ability, even while holding that states are not required to draw districts maximizing this potential.
Nor do the Bartlett Court’s concerns under section 2 speak to our task under section 5. Part of the Court’s analysis rested on the difficulties of predicting whether a potential coalition would provide minorities with an opportunity to elect. Id. at 17, 129 S.Ct. 1231. Section 5, by contrast, asks whether an existing coalition has achieved an ability to elect. Section 5 does not call on us to guess the future, but to determine whether there is past evidence of a demonstrated ability to elect. And while section 2 does not demand granting “special protection to a minority group’s right to form political coalitions” or “impose on those who draw election districts a duty to give minority voters the most potential, or the best potential, to elect a candidate by attracting crossover voters,” id. at 15, 129 S.Ct. 1231, section 5 mandates that we ensure that “the gains thus far achieved in minority political participation [are] not destroyed,” Beer, 425 U.S. at 141, 96 S.Ct. 1357 (quoting S.Rep. No. 94-295, at 19 (1975), 1975 U.S.C.C.A.N. 774, 785). To be sure, forcing a state to create crossover districts would reach beyond section 2’s equality mandate, but nothing in Bartlett suggests that courts can turn a blind eye towards a district in which minority voters have already turned electoral opportunity into ability to elect.
And nothing in Perez extends the reasoning in Bartlett to section 5. Perez held only that the district court had no basis to draw a new coalition district under section 2, without addressing the separate question before us: whether preexisting coalition or crossover districts merit protection under section 5. See Perez, 132 S.Ct. at 944. Thus, although section 2 does not require states to draw new crossover districts, we read section 5’s ban on retrogression to extend protection to districts in which minority voters have demonstrated an ability to elect their preferred candidates via either assembling a coalition or attracting sufficient crossover votes, or both.
b. Standard of Proof
As we stated in our summary judgment opinion, proving the existence of coalition and crossover districts “require[s] more exacting evidence than would be needed to prove the existence of a majority-minority district.” Texas, 831 F.Supp.2d at 268. The discussion that follows explains the test we have applied.
At the outset, the minority group or groups must vote cohesively in coalition and crossover districts, just as they must in protected majority-minority districts. See Growe v. Emison, 507 U.S. 25, 41, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (noting that proving political cohesion across an “agglomerated political bloc” — ie., a coalition- — “is all the more essential” than the need to prove cohesion within a single minority group).[16] If minority groups split *150 their vote between opposing candidates in the general election, there is by definition no candidate of choice, and the district is not protected under section 5.
While the first inquiry considers whether minority voters have a candidate of choice, the next inquiry is grounded in a different part of section 5: do minority voters have the “ability to elect” their preferred candidate? See 42 U.S.C. § 1973c. In other words, are the groups large enough, motivated enough, or influential enough to elect their candidate of choice— and have they in fact done so? This question is in many respects similar to that for majority-minority ability districts. There is no single, clearly defined metric to determine when a minority group has an ability to elect, so we use a multi-factored approach to determine when a coalition or crossover district achieves that ability. See Growe, 507 U.S. at 41, 113 S.Ct. 1075 (pointing to anecdotal evidence, statistical evidence of minority political cohesion, and racial bloc voting as some of the factors relevant to prove the existence of a coalition district under section 2); Texas, 831 F.Supp.2d at 268 (“[Tjhere must be discrete data, by way of election returns, to confirm the existence of a voting coalition’s electoral power.”).
A coalition district is protected under section 5 if there is sufficient evidence to find that minorities voté cohesively and have the ability to elect their preferred candidates. The same two inquiries apply to a crossover district, but the ability-to-elect analysis is more complicated. Although election returns are necessary to show that minority voters in a crossover district have a track record of success— results are the coin of the realm — it is not enough that they simply go along with the electoral decisions of some of the district’s Anglo voters.[17] We must also be satisfied that it is the minority voters themselves who have the ability to elect their preferred candidate.
The test to establish this ability must be rigorous enough to avoid the scenario Texas describes: that section 5 will be interpreted to protect any district that elects a Democrat, no matter how small its minority population. In other words, that minority voters are needed to win an election does not in itself prove that they have an ability to elect. As an extreme example of this concern, consider a district with a 90% Anglo and 10% minority population. If the Anglo vote splits evenly between Democrats and Republicans and minorities vote overwhelmingly Democratic, then the Democratic candidate will win with approximately 55% of the vote, and the minority vote will properly be viewed as essential to victory every time. Yet this would not be a district in which the minority group has an ability to elect; the Anglos do. Such a district would merely be a Democratic district that happens to contain a minority group. If we were to hold otherwise, then every district that consistently elects a Democrat with the minority vote providing the margin of victory, no matter how small, would qualify for protection under section 5. This would stretch the scope of section 5 too far. A protected crossover district is not created each time *151 Anglos and minorities vote together to elect a candidate.
With respect to both coalition and crossover districts, we require “more exacting evidence” to prove that minority voters have an ability to elect than we do for majority-minority ability districts. Texas, 831 F.Supp.2d at 268. Doing so ensures that we stay within the boundaries of section 5 and protect only those districts in which minority voters have demonstrated their effectiveness. Yet where that standard is met — where minority voters themselves “pull, haul, and trade” to elect their preferred candidates, De Grandy, 512 U.S. at 1020,114 S.Ct. 2647 — then the district is one in which minority voters have an ability to elect, and section 5’s safeguards apply.[18]
B. Discriminatory Intent
In Reno v. Bossier Parish School Board (Bossier II), 528 U.S. 320, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000), the Supreme Court considered whether section 5 barred a plan that “would have no retrogressive effect” but “nonetheless ... was enacted for a discriminatory ‘purpose.’ ” Id. at 325, 120 S.Ct. 866. The Court held that it did not, concluding that the purpose prong extended only to intent to retrogress, not to all intentional discrimination. Thus, section 5, the Court wrote, would catch only an “incompetent retrogressor,” but offered no recourse against a mapdrawer who intended to discriminate against minority voters using methods that did not create retrogression. Id. at 332, 120 S.Ct. 866. In direct response, the 2006 amendments to section 5 clarified that the term “purpose” must be read more broadly and includes “any discriminatory purpose.” 42 U.S.C. § 1973c(c); see also H.R.Rep. No. 109-478, at 93, 2006 U.S.C.C.A.N. 618, 678 (stating that Congress “rejects the Supreme Court’s holding in Reno v. Bossier Parish”). As a result, we may not preclear any redistricting plan enacted with discriminatory intent.
Texas argues that it should not be required to prove that it lacked any discriminatory purpose. Saddling a state with that burden, so the argument goes, adds too much to the serious federalism costs already imposed by preclearance and could “exceed Congress’ enforcement authority under the Fifteenth Amendment and violate the Tenth Amendment.” Tex. Post-Trial Br. 17-18. The only way to avoid this problem, Texas claims, is to shift the burden of proof for discriminatory intent from Texas onto the United States and the Intervenors. Id. at 18. We acknowledge the substantial federalism costs of section 5, see Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 203-04, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009) (stating that the preclearance remedy implicates serious federalism concerns), and recognize the difficulty of proving a negative. Yet it is settled law that Texas bears the burden of proving lack of discriminatory intent. See, e.g., Pleasant Grove, 479 U.S. at 469, 107 S.Ct. 794 (“The burden of proving absence of discriminatory purpose and effect is on [the covered jurisdiction].”); City of Rome v. United States, 446 U.S. 156, 183 n. 18, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (“Under § 5, the city bears the burden of proving lack of discriminatory purpose and effect.”); Beer, 425 U.S. at 140-41, 96 S.Ct. 1357; Georgia v. United States, 411 U.S. 526, 538, 93 5.Ct. 1702, 36 L.Ed.2d 472 (1973); South Carolina v. Katzenbach, 383 U.S. 301, 335, *152 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Texas has pointed to no evidence that Congress intended to modify this established understanding.
Moreover, Texas’s burden is not insurmountable.[19] There is no question, as the Supreme Court has previously stated, that “assessing a jurisdiction’s motivation in enacting voting changes is a complex task requiring a ‘sensitive inquiry into such circumstantial and direct evidence as may be available.’ ” Reno v. Bossier Parish Sch. Bd. (Bossier I), 520 U.S. 471, 488, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). And as Texas rightly argues, this task is all the more difficult because disparate impact alone is insufficient to establish discriminatory purpose, see Bush v. Vera, 517 U.S. 952, 968, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (“If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify____”). But we have clear direction how to conduct this “complex task” from Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). See Bossier I, 520 U.S. at 488, 117 S.Ct. 1491 (“In conducting [a section 5 purpose] inquiry, courts should look to ... Arlington Heights for guidance.”); see also H.R.Rep. No. 109-478, at 68, 2006 U.S.C.C.A.N. 618, 669 (“[T]he factors set out in [Arlington Heights ] provide an adequate framework for determining whether voting changes submitted for preclearance were motivated by a discriminatory purpose.... ”). There, the Court set forth a framework for analyzing “whether invidious discriminatory purpose was a motivating factor” in a government body’s decisionmaking. Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555; see also Bossier I, 520 U.S. at 488-89, 117 S.Ct. 1491 (collecting cases in which courts have applied Arlington Heights in the section 5 context). We follow this well-worn path and base our inquiry upon the five Arlington Heights factors: (1) discriminatory impact, (2) historical background, (3) sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decisionmaking process, and (5) contemporaneous viewpoints expressed by the decisionmakers. Arlington Heights, 429 U.S. at 266-68, 97 S.Ct. 555. Texas can carry its burden by showing that these factors — the longstanding yardstick for determining discriminatory intent — do not, taken together, show discriminatory purpose.
III. Congressional Plan
We now turn to the merits of the three plans before us, considering in turn whether Texas has carried its burden to prove the absence of discriminatory purpose and effect in the Congressional, Senate, and House Plans.
A. Retrogression in the Congressional Plan
There are thirty-six districts in the enacted Congressional Plan. Certain Interve *153 nors argue that the enacted plan has one fewer ability district than the benchmark because three ability districts — Congressional Districts (CDs) 28, 25, and 27 — are lost and only two ability districts — CDs 34 and 35 — are added. There is no dispute that these two new districts are Hispanic ability districts. Texas agrees that CD 27 is a lost ability district, but disputes that benchmark CDs 23 and 25 are ability districts. Under Texas’s theory, the Congressional Plan results in a net increase of one Hispanic ability district.
The United States and certain Intervenors argue that the enacted Congressional Plan retrogresses by failing to draw an additional Hispanic ability district. They assert that CDs 23 and 27, but not CD 25, were Hispanic ability districts in the benchmark whose loss in the enacted plan is offset by the gain of CDs 34 and 35. Nevertheless, in light of the growth in the State’s Hispanic population, they argue that failing to draw one of the four new congressional districts as a Hispanic ability district increases the degree of Hispanic disenfranchisement from the benchmark level and thus violates section 5.
In addition to these arguments about Hispanic ability districts, some of the Intervenors argue that the Congressional Plan is retrogressive with respect to Black voters as well. All parties agree that CDs 9, 18, and 30 are ability districts for Black voters in both the benchmark and enacted congressional maps. Some of the Intervenors allege that the enacted plan “packed” these districts with Black voters from neighboring jurisdictions that were not performing for minority voters. But because section 5’s effect prong does not prohibit reductions in minority voting power in nonability districts, we find no retrogression in Black ability districts in the Congressional Plan.
We do, however, conclude that the enacted Congressional Plan is retrogressive and thus cannot be precleared under section 5. Although we differ among ourselves whether benchmark CD 25 was an ability district, this disagreement does not affect our overall conclusion. At the outset, we discuss the two disputed ability districts upon which we agree, then explain the majority’s conclusion that Texas was required to draw a new ability district under section 5. We set out our separate views on CD 25 at the end of the opinion.
1. Congressional District 27
Benchmark CD 27 includes the cities of Corpus Christi and Brownsville in southeastern Texas. With a Hispanic Citizen Voting Age Population (HCVAP) of 63.8%, Pl.’s Ex. 11, at 9, and, until 2010, a twenty-seven year history of representation by a Hispanic Democrat, benchmark CD 27 is a clear Hispanic ability district. Although an Anglo Republican won the seat with a 775 vote margin in 2010, Pl.’s Ex. 32, at 13, no party argues that this anomalous result is reason to doubt the district’s status as an ability district. Indeed, Texas’s own expert conceded that the district had “performed” from the time of its creation for close to thirty years until the 2010 election, Defs.’ Ex. 581, Trial Tr. 1870:16-1871:4, Sept. 14, 2011, Perez, No. ll-cv-360, and Kel Seliger, chairman of the Texas Senate Select Committee on Redistricting, testified that benchmark CD 27 is clearly protected by the VRA and that he felt the legislature needed to draw another district to compensate for its loss, Seliger San Antonio Dep. 25:22-26:13; see also Trial Tr. 17:19-18:11, Jan. 24, 2012 AM.
The enacted plan pivots CD 27 roughly 180 degrees such that the old northern boundary of the district is now the new southern boundary, with new CD 34 filling in much of CD 27’s old geography. The result is that enacted CD 27 is a majority-Anglo district: HCVAP drops to only 41.1%. PL’s Ex. 12, at 9. All parties agree *154 that these significant geographic and demographic shifts mean that CD 27 will no longer perform for minority voters. We agree.
2. Congressional District 23
West Texas’s CD 23 has a complicated history under the VRA. In 2006, the Supreme Court held that CD 23, as then constituted, violated section 2. See LULAC v. Perry, 548 U.S. 399, 425-42, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006). In response, the U.S. District Court for the Eastern District of Texas redrew its boundaries in 2006 to be an “opportunity district,” or one in which Hispanic voters would have an opportunity to elect their preferred candidates, as required by section 2. See Defs.’ Ex. 575, Trial Tr. 300:13-18, Sept. 7, 2011, Perez, No. ll-cv-360. We now find that the Hispanic voters in CD 23 turned that opportunity into a demonstrated ability to elect, but that the 2010 redistricting took that ability away.
Benchmark CD 23 has an HCVAP of 58.4%. Pl.’s Ex. 11, at 9. During the most recent redistricting, the mapdrawers in the Texas legislature acknowledged that CD 23 was a protected district under the VRA. See, e.g., Seliger San Antonio Dep. 13:19-15:11, 30:6-15, 31:6-16 (testimony of Chairman Seliger describing his belief during the redistricting process that CD 23 was a protected Hispanic district); Defs.’ Ex. 978 (email from congressional mapdrawer Doug Davis to National Republican Congressional Committee staffer noting VRA concerns when drawing CD 23). CD 23 elected the minority-preferred candidate in two out of the three endogenous elections since its boundaries were redrawn in 2006. Defs.’ Ex. 327, Dr. Lisa Handley, A Section 5 Voting Rights Analysis of the Proposed Texas Congressional Plan 5 [hereinafter Handley Cong. Rep.]. The one narrow loss was in 2010, a year that Chairman Seliger described as “a bit of an aberration because of things like the Tea Party influence,” further noting that he “didn’t know if [that election] was reliable.” Seliger San Antonio Dep. 15:5-7; see also Trial Tr. 11:15-21, Jan. 24, 2012 AM.[20]
Texas counters that none of the experts found that benchmark CD 23 clearly performs as an ability district and points to the weak showing of minority voters in exogenous elections: only three out of ten victories in the OAG 10 and two out of five victories in Dr. Handley’s election set. Alford Rep. 23 tbl.4b; Handley Cong. Rep. 5. But these numbers do not tell the full story. Every expert save Dr. Alford concluded that benchmark CD 23 is an ability district despite marginal exogenous performance. Dr. Handley concluded that endogenous results are more probative than exogenous for this district, see Handley Cong. Rep. 5-6, and, as we have already discussed, we agree that this assessment is generally accurate. Dr. Ansolabehere’s analysis shows that minority-preferred candidates won the district “more often than not.” Defs.’ Ex. 724, Expert Witness Report of Dr. Stephen Ansolabehere 36-37 [hereinafter Ansolabehere Rep.]. And the TLRTF argues that a larger election sample set is necessary to make an informed *155 judgment. When four additional racially contested contests are added to the OAG 10, the district’s exogenous success rises to seven out of fourteen. See Trial Tr. 111:14-113:4, Jan. 18, 2012 AM; Defs.’ Exs. 390, 647. These election results, combined with the endogenous elections discussed above, the fact that CD 23 was drawn to be an opportunity district, and the contemporary views of redistricting officials, are enough for us to find that benchmark CD 23 lived up to its potential as drawn in 2006 and became an ability district.
But enacted CD 23 is not. Even though the district’s demographics remain relatively unchanged — HCVAP actually increased 0.1% from the benchmark to the enacted plan, Pl.’s Ex. 12, at 9 — this fact is inconclusive. Instead, we must look to other factors, including exogenous elections, testimony, and other evidence about changes made in the district.
Enacted CD 23’s exogenous election results are significantly worse than those in benchmark CD 23. In the OAG 10, the number of victories decreases from three of ten to one. In Dr. Handley’s sample the number decreases from two of five to none. Alford Rep. 23 tbl.4b; Handley Cong. Rep. 7; see also Ansolabehere Rep. 37 (concluding that the enacted plan “lowers the electoral performance of minority-preferred candidates in the District to the point that it is likely no longer a minority opportunity seat”). Minority voter turnout in enacted CD 23 declines. While Hispanic voters accounted for an average of 39% of total votes cast in benchmark CD 23 over the past decade, they made up only 36.5% in enacted CD 23.[21] Defs.’ Ex. 365, at 5-12; see also, e.g., Defs.’ Ex. 575, Trial Tr. 450:19-454:11, Sept. 7, 2011, Perez, No. ll-ev-360 (testimony of Dr. Henry Flores, noting that Hispanic voter turnout was higher in areas moved out of the district than in areas that were moved in; turnout in some excluded areas was consistently over 30%, while turnout in areas that replaced them was only 25-30%). The changes were enough to “nudge” a district that was an ability district, but barely so, to a nonperforming district. See Ansolabehere Rep. 37 (noting that “in a competitive district such as this one,” seemingly small changes “made a huge difference”). Even Texas’s expert testified that CD 23 “is probably less likely to perform than it was, and so I certainly wouldn’t count and don’t [and] haven’t counted the 23rd as an effective minority district in the newly adopted plan.” Defs.’ Ex. 581, Trial Tr. 1839:2-7, Sept. 14, 2011, Perez, No. 11-cv-360. Thus, CD 23 is an ability district in the benchmark, but would be no longer in the enacted plan.
Texas claims that the enacted district has remained functionally identical to the benchmark, but these claims are undermined by the mapdrawers’ own admissions that they tried to make the district more Republican — and consequently, less dependable for minority-preferred candidates — without changing the district’s Hispanic population levels. The mapdrawers consciously replaced many of the district’s active Hispanic voters with low-turnout Hispanic voters in an effort to strengthen the voting power of CD 23’s Anglo citizens. In other words, they sought to reduce Hispanic voters’ ability to elect without making it look like anything in CD 23 had changed. See, e.g., Defs.’ Ex. 304 (email from Eric Opiela, counsel to Texas House Speaker Joe Straus, to mapdrawer Gerardo Interiano in November 2010 urging Interiano to find a metric to “help pull the *156 district’s Total Hispanic Population] and Hispanic CVAPs up to majority status, but leave the Spanish Surname [Registered Voter] and [turnout numbers] the lowest,” which would be “especially valuable in shoring up [CD 23 incumbent] Canseco”); id. (email from Interiano responding that he would “gladly help with this”); Defs.’ Ex. 739, at 40 (email indicating that Opiela provided sample maps to Interiano as late as June 11, 2011, that would “improve CD 23’s [H]ispanic performance while maintaining it as a Republican district”). We also received an abundance of evidence that Texas, in fact, followed this course by using various techniques to maintain the semblance of Hispanic voting power in the district while decreasing its effectiveness. See, e.g., Defs.’ Ex. 436 (evidence showing that over 600,000 persons were moved into and out of the district to redress overpopulation of only 149,000); Defs.’ Ex. 903, at 1 (email noting that a draft map of CD 23 was “over 59% HCVAP, but still at 1/10 [exogenous election performance],” and commenting that there must be an HCVAP level high enough that low election results would not raise trouble under section 5); Defs.’ Ex. 978 (email commenting that a draft map of CD 23 “looks nice politically,” but still raises “eoncern[s] about the Voting Rights Act”); Trial Tr. 106:18-108:3, Jan. 18, 2012 AM (testimony of Ryan Downton that he drew the district’s lines precinct-by-precinct based on election results to keep Hispanic population numbers high while maximizing Republican performance); Id. at 12:2-16, Jan. 24, 2012 AM (testimony of Kel Seliger that CD 23 was drawn by considering “voting patterns and ethnicity” to see what could be done “to change the district”). Texas’s protestations that the district has remained functionally identical are weakened first by the mapdrawers’ admissions that they tried to reduce the effectiveness of the Hispanic vote and then, more powerfully, by evidence that they did. We conclude that CD 23 is a lost ability district.
3. Retrogression with New Congressional Seats[22]
Texas’s population grew by approximately 4.3 million in the past decade, an increase of 20.6%. Approximately 89% of this growth was from non-Anglo minorities: Hispanics comprise 65% of the increase, Blacks 13.4%, and Asian-Americans 10.1%. See U.S. Req. for Judicial Notice ¶¶ 8, 20, 22, 24 (citing 2000 and 2010 Census data).[23] As a result of this increase, the Texas delegation in the U.S. House of Representatives grew from 32 to 36 members, the largest growth ever in a jurisdiction fully covered by section 5. See Texas, 831 F.Supp.2d at 257. The United States and various Intervenors argue that Texas was required to draw at least one of these new districts as an ability district. See, e.g., U.S. Post-Trial Br. 14-15. We agree.
As already discussed, section 5’s prohibition on retrogression means that “the entire [enacted] statewide plan as a whole,” Ashcroft, 539 U.S. at 470, 123 S.Ct. 2498, cannot “increase the degree of dis *157 crimination against [minority voters],”[24] City of Lockhart v. United States, 460 U.S. 125, 134, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983). Abrams v. Johnson, 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997), tells us how to measure the degree of discrimination when the number of districts remains the same or increases by one: there is no retrogression as long as the number of ability districts remains the same. Id. at 97-98, 117 S.Ct. 1925. At summary judgment we concluded that our case was similar to Abrams because “Texas’ percentage gain in congressional seats (12.5%) is similar to Georgia’s percentage gain in Abrams (10%).” Texas, 831 F.Supp.2d at 269. Yet we also noted that “Abrams does not control. Although Abrams is clear that the VRA does not require there to be a new minority ability district for every new congressional seat, it does not hold that a state’s failure to draw new minority districts can never be retrogressive.” Id. Upon further examination and after weighing the arguments presented at trial, we have concluded that Texas’s failure to draw a new minority district does in fact make the enacted plan retrogressive under the specific facts of this case. Abrams spoke only to the case of a state that gained a single seat, 521 U.S. at 97-98, 117 S.Ct. 1925, not to the case of a state that gains multiple seats.[25]
Neither section 5’s text nor existing case law tells us how to measure the “degree of discrimination” in these circumstances. But guidance is available in the Supreme Court’s section 2 cases. Even though section 5 is not ameliorative and has different purposes than section 2, some tools used in section 2 analysis reveal insights into the underlying principles of the VRA, see, e.g., Texas, 831 F.Supp.2d at 261-62 & 262 n. 21, which are especially helpful as we find ourselves in a setting no section 5 cases have yet considered.
In the section 2 context, the Court has looked to the relationship between a minority group’s share of the CVAP statewide and the number of opportunity districts to help determine whether new opportunity districts must be created. See LULAC, 548 U.S. at 438, 126 S.Ct. 2594 (“Looking statewide, there are 32 congressional districts. The five reasonably compact Latino opportunity districts amount to roughly 16% of the total [number of districts], while Latinos make up 22% of Texas’ citizen voting-age population---- Latinos are, therefore, two districts shy of proportional representation.”); De Grandy, 512 U.S. at 1014 n. 11, 114 S.Ct. 2647 (examining “the number of majority-minority voting districts [compared] to minority members’ share of the relevant population”). We agree with the United States that this “representation gap” between the number of districts proportional representation would yield and the number of districts the legislature has actually created is a strong indicator of the “degree of discrimination.” U.S. Post-Trial Br. 15. When the representation gap grows, the degree of discrimination increases.
This analysis squares with the outcomes of previous section 5 cases. Where the number of districts remains the same, the *158 representation gap does not increase. Likewise, the representation gap in Abrams was unchanged between plans. There, Blacks constituted 27% of Georgia’s voting age population and had the ability to elect in only one of ten districts in the benchmark plan. See 521 U.S. at 103, 117 S.Ct. 1925 (Breyer, J., dissenting). That put the representation gap at two districts (27% of 10 is 2.7, which, when rounded up, is two more than one).[26] In the enacted plan the representation gap remained the same (27% of 11 is 3.0, which is also two more than one). There was no increase in the degree of discrimination, and the plan did not retrogress.
By contrast, the representation gap in Texas has increased. The Black and Hispanic communities currently make up 39.3% of Texas’s CVAP. Joint Stipulations of Fact ¶ 38. Thus, if districts were allocated proportionally, there would be 13 minority districts out of the 32 in the benchmark (39.3% of 32 is 12.6). Yet minorities have only 10 seats in the benchmark, so the representation gap is three districts. In the enacted plan, proportional representation would yield 14 ability districts (39.3% of 36 is 14.1), but there are still only 10 ability districts.[27] Thus, the representation gap in the enacted plan is four districts. Because this gap increases by one district, we cannot preclear the enacted plan.[28]
We emphasize what our analysis does not do. It does not entitle minorities to proportional representation. It does not require a state to create new ability districts in proportion to increases in a minority group’s population.[29] We require *159 only that a state not “undo[ ] or defeat[ ] the rights recently won” by minorities, Beer, 425 U.S. at 140, 96 S.Ct. 1357 (quoting H.R.Rep. No. 91-397, at 8 (1969), 1970 U.S.C.C.A.N. 3277, 3284) (internal quotation marks omitted), by increasing the “degree of discrimination,” Lockhart, 460 U.S. at 134, 103 S.Ct. 998, which requires assessing the “number of majority-minority voting districts to minority members’ share of the relevant population,” De Grandy, 512 U.S. at 1014 n. 11, 114 S.Ct. 2647. Because the Texas legislature purposes to increase this representation gap, we cannot preclear its Congressional Plan.
B. Discriminatory Intent in the Congressional Plan
Although we need not reach the issue of discriminatory intent because we conclude that the Congressional Plan will have a retrogressive effect, we do so here because, as we have just discussed, we do not all agree on the appropriate rationale for finding retrogression. But because we agree that the plan was enacted with discriminatory purpose, we reach this issue as an alternative, unanimous basis to deny preclearance for the Congressional Plan. If true, the allegations of the United States and the Intervenors that Texas drew the Congressional Plan with discriminatory purpose provide grounds to deny preclearance. Texas argues that intent to discriminate against minority voters played no role in the plan and that its decisions were motivated solely by partisan politics. See, e.g., Tex. Posh-Trial Br. 26 (“Texas adopted the Congressional Plan with the lawful aim of protecting incumbents.”).
There is no direct evidence that the enacted plan was motivated by discriminatory purpose; no emails, letters, or testimony about conversations between those members involved in congressional redistricting disclose such an intent. Cf. Diaz v. Kraft Foods Global, Inc., 653 F.3d 582, 587 (7th Cir.2011) (“Direct evidence is something close to an explicit admission ... that a particular decision was motivated by discrimination; this type of evidence is rare, but it ‘uniquely reveals’ the ... intent to discriminate.” (quoting Rudin v. Lincoln Land Cmty. Coll., 420 F.3d 712, 720 (7th Cir.2005))). Thus, we must assess the circumstances surrounding the drawing of the new maps. Our analysis follows the Supreme Court’s decision in Arlington Heights, which, as discussed in more detail above, identifies five “subjects of proper inquiry in determining whether racially discriminatory intent existed”: (1) discriminatory impact, (2) historical background, (3) sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decisionmaking process, and (5) contemporaneous viewpoints expressed by the decisionmakers. Arlington Heights, 429 U.S. at 266-68, 97 S.Ct. 555.
As we have already noted, CDs 9, 18, and 30 are the only Black ability districts in the benchmark and enacted plans. CD 9 is located south of Houston and incorporates parts of Harris and Fort Bend Counties, CD 18 is located within Houston, and CD 30 is within Dallas. The Texas legislature proposed substantial changes to these districts even though the 2010 Census data shows the population in each was already close to the ideal size.[30] We have already *160 determined that these changes are not retrogressive, but they raise serious concerns about what motivated the Congressional Plan.
Congressman A1 Green, who represents CD 9, testified that “substantial surgery” was done to his district that could not have happened by accident. The Medical Center, Astrodome, rail line, and Houston Baptist University — the “economic engines” of the district — were all removed in the enacted plan. Trial Tr. 124:6-20, Jan. 20, 2012 AM; see also Defs.’ Ex. 721, PreFiled Test, of Congressman Alexander Green 3^4. The enacted plan also removed from CD 9 the area where Representative Green had established his district office. Trial Tr. 124:16, Jan. 20, 2012 AM. Likewise, Congresswoman Sheila Jackson Lee, who represents CD 18, testified that the plan removed from her district key economic generators as well as her district office. Id. at 13:13-14:5, Jan. 23, 2012 PM. Congresswoman Eddie Bernice Johnson of CD 30 also testified that the plan removed the American Center (home of the Dallas Mavericks), the arts district, her district office, and her home from CD 30. Id. at 79:20-81:16, Jan. 18, 2012 PM. The map-drawers also removed the district office, the Alamo, and the Convention Center (named after the incumbent’s father), from CD 20, a Hispanic ability district. Mem. Opp. Summ. J. Ex. 16, Decl. of Charles A. Gonzalez ¶¶ 3-9,11, ECF No. 77.
No such surgery was performed on the districts of Anglo incumbents. In fact, every Anglo member of Congress retained his or her district office. Trial Tr. 14:12-15, Jan. 23, 2012 PM. Anglo district boundaries were redrawn to include particular country clubs and, in one case, the school belonging to the incumbent’s grandchildren. See Mem. Opp. Summ. J. Exs. 11, 18-19, ECF No. 77. And Texas never challenged evidence that only minority districts lost their economic centers by showing, for example, that the same types of changes had been made in Anglo districts.
The United States and the Intervenors convincingly argue — and Texas does not dispute — that removing district offices from minority ability districts but not from Anglo districts has a disparate impact on the minority districts. See U.S. Post-Trial Br. 26. District offices help “provide[] a meaningful connection between a member and the people represented.” Defs.’ Ex. 721, Pre-Filed Test, of Congressman Alexander Green 4. Their locations are often well known to constituents, often placed to be easily accessible by freeway and public transportation, and serve as a way for members of Congress to communicate with and provide services to their constituents. See id. We are likewise troubled by the unchallenged evidence that the legislature removed the economic guts from the Black ability districts. Texas does not dispute that part of a member of Congress’s job is to “bring economic generators that will benefit that community,” id. Removing those economic generators harms the district. Id. at 3-4; U.S. Post-Trial Br. 26.
The only explanation Texas offers for this pattern is “coincidence.”[31] Trial Tr. 95:5-19, Jan. 25, 2012 PM. But if this was coincidence, it was a striking one indeed. It is difficult to believe that pure chance would lead to such results. The State also argues that it “attempted to accommodate unsolicited requests from a bipartisan group of lawmakers,” and that “[wjithout hearing from the members, the mapdrawers did not know where district offices were located.” Tex. Post-Trial Br. 29. But we find this hard to believe as well. We are confident that the mapdrawers can not only draw maps but read them, and *161 the locations of these district offices were not secret. The improbability of these events alone could well qualify as a “clear pattern, unexplainable on grounds other than race,” Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555, and lead us to infer a discriminatory purpose behind the Congressional Plan.
When taken with the remaining Arlington Heights factors, Texas’s explanation becomes weaker still. First, the historical background gives us grounds for concern. In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost. See, e.g., LULAC, 548 U.S. 399, 126 S.Ct. 2594; Vera, 517 U.S. 952, 116 S.Ct. 1941; Upham v. Seamon, 456 U.S. 37,102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); White v. Weiser, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Terrazas v. Slagle, 789 F.Supp. 828 (W.D.Tex.1992), aff'd sub nom., Richards v. Terrazas, 505 U.S. 1214, 112 S.Ct. 3019, 120 L.Ed.2d 891 (1992) (mem.). While a losing streak alone does not control our decision, Texas’s history of failures to comply with the VRA is one of the circumstantial factors that Arlington Heights instructs us to consider.
Next, the sequence of events leading to the passage of the Congressional Plan also supports an inference of discriminatory purpose. Black and Hispanic members of Congress testified at trial that they were excluded completely from the process of drafting new maps, while the preferences of Anglo members were frequently solicited and honored. See, e.g., Mem. Opp. Summ. J. Exs. 18-19; Defs.’ Ex. 370, at 1, ECF No. 77. The Texas House and Senate redistricting committees released a joint congressional redistricting proposal for the public to view only after the start of a special legislative session, and each provided only seventy-two hours’ notice before the sole public hearing on the proposed plan in each committee. See, e.g., Defs.’ Ex. 320, Decl. of Theodore S. Arrington 57-59; Defs.’ Ex. 366. Minority members of the Texas legislature also raised concerns regarding their exclusion from the drafting process and their inability to influence the plan via amendments. See, e.g., Defs.’ Ex. 370, at 1.
Lastly, procedural and substantive departures from the normal decisionmaking process raise flags. Citing failure to release a redistricting proposal during the regular session, the limited time for review, and the failure to provide counsel with the necessary election data to evaluate VRA compliance, the Senate redistricting committee’s outside counsel described the proceedings as “quite different from what we’ve seen in the past.” Id. at 2.
Texas argues that, “[a]t worst, the evidence shows that [it] was guilty of blithe indifference to the wants to certain [minority] Congressmen.” Tex. Posh-Trial Br. 29. But we do not find this explanation credible. Although we have already concluded that the Congressional Plan cannot be precleared under section 5’s effect prong, we are also persuaded by the totality of the evidence that the plan was enacted with discriminatory intent. Texas did not adequately engage with the evidence raised by the other parties on this point, and under Arlington Heights we find sufficient evidence to conclude that the Congressional Plan was motivated, at least in part, by discriminatory intent.[32] There *162 fore, we deny Texas declaratory judgment with respect to the Congressional Plan on this ground as well.
IV. State Senate Plan
Next we consider Texas’s request to preclear its State Senate Plan. The United States has not objected to this plan, but the Davis Intervenors, the Texas State Conference of NAACP Branches, the League of United Latin America Citizens, and the Texas Legislative Black Caucus argue that the Senate Plan retrogresses and was enacted with discriminatory intent. Their arguments concern a single district, Senate District (SD) 10, which they contend is a coalition district in the benchmark plan, and which all parties agree is not an ability district in the enacted plan. These Intervenors also argue that discriminatory purpose motivated the legislature’s decision to break up SD 10. We conclude that benchmark SD 10 is not a coalition district, and thus that the Senate Plan is not retrogressive. Nevertheless, we deny preclearance because Texas failed to carry its burden to show that it acted without discriminatory purpose in the face of largely unrebutted defense evidence and clear on-the-ground evidence of “cracking” minority communities of interest in SD 10. Thus, we conclude that the Texas legislature redrew the boundaries for SD 10 with discriminatory intent.
A. Retrogression in the Senate Plan
Benchmark SD 10 is located entirely within Tarrant County, which includes Fort Worth. When the Texas legislature last drew the district in 2001, the population was 56.6% Anglo, 16.7% Black, and 22.9% Hispanic. Defs.’ Ex. 126, 2001 State of Texas Submission for State Senate Preclearance app. I (Aug. 15, 2001). Urging the Department of Justice to preclear the 2001 State Senate Plan, Texas justified SD 10’s configuration by arguing that “[t]he voting strength of these minority communities in the future will depend on the cohesion within and between Black and Hispanic voters and the ability of such voters to form coalitions with other racial or ethnic groups in support of their preferred candidates.” Id. at 18. In other words, Texas argued that SD 10 had the potential to become a coalition district.
The Department of Justice precleared the 2001 map, and, over the past decade, the minority population in SD 10 has continued to grow. According to the 2010 Census, 47.6% of the population in SD 10 was Anglo, 19.2% Black, and 28.9% Hispanic. Defs.’ Ex. 151, at 5. Minorities made up a smaller portion of the 2010 CVAP, however: 62.7% were Anglo, 18.3% Black, and 15.1% Hispanic. PL’s Ex. 15, at 8. Republicans have won almost every election in SD 10 in the past ten years, including the district’s endogenous State Senate elections from 2000-2008. No Democratic candidate running in a statewide or other exogenous election has ever won a majority of the vote in SD 10. See Alford Rep. 30.
The only Democrat to win an election in SD 10 is the district’s current senator, Wendy Davis, who was elected to a four-year term in 2008. Davis’s path to the State Senate began when Democratic candidate Terri Moore lost the 2006 election for Tarrant County District Attorney, yet received nearly half of the vote in SD 10. See Trial Tr. 30:10-25, 31:1-17, Jan. 18, 2012 PM. In light of these results, Democratic elected officials and community leaders in Tarrant County were of the view that if the Black and Hispanic communities “came together as a coalition to vote ... they could win Senate District 10.” Id. at 30:15-16. These and other leaders within the district’s minority communities recruited Fort Worth City Council member Wendy Davis to run for State Senate. Id. at 32:3-25, 33:1-17; see also id. at 16:1-5, *163 Jan. 20, 2012 AM (Senator Davis, testifying, “I was approached by leaders in our minority community in large part because of the work I’d done as a City Council person and asked if I would consider running for the Texas State Senate.”). Senator Davis ran unopposed in the 2008 Democratic primary, see Pl.’s Ex. 135, at 3, then won the general election with 49.9% of the vote, beating the incumbent by 2.4% — approximately 7,100 out of 288,000 votes cast.[33] Pl.’s Ex. 31, at 14.
According to Texas’s expert, Davis received 99.6% of the Black vote, 85.3% of the Hispanic vote, and 25.8% of the Anglo vote. Trial Tr. 32:24-25, 33:1-16, Jan. 25, 2012 AM. Although this is strong evidence that the minority communities in SD 10 voted cohesively in the 2008 election, the argument that SD 10 is a coalition district runs into trouble when looking at evidence that the district’s minority communities have been effective in electing their preferred candidates.
At summary judgment, we noted that “evidence that a coalition had historical success in electing its candidates of choice would demonstrate that the minority voters in that district had, and would continue to have, an ability to elect their preferred candidates.” Texas, 831 F.Supp.2d at 268. The case that SD 10 is an ability district turns on a single, razor-thin election victory, which is not “historical success.” Indeed, SD 10’s decade-long history of electing Republicans shows just the opposite. There is no doubt that the minority community came together to elect a preferred candidate in 2008, but a single victory is not the more exacting evidence needed for a coalition district. If it were, any single victory built upon the support of minority voters would create a claim for ability status.
B. Discriminatory Intent in the Senate Plan
There is no direct evidence that the Texas legislature acted with a racially discriminatory purpose in its reconfiguration of SD 10, and so we must look to circumstantial evidence. Once again, we look to the Arlington Heights factors to determine whether Texas has met its burden of disproving discriminatory intent.
Considering first the impact of the redistricting — “whether it ‘bears more heavily on one race than another,’ ” Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555 (quoting Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)), there is little question that dismantling SD 10 had a disparate impact on racial minority groups in the district. Even Dr. Alford agreed that the enacted plan “diminishes the voting strengths of Blacks and Latinos in [SD 10],” Trial Tr. 39:14, Jan. 25, 2012 AM. In a letter he sent to the Department of Justice objecting to the enacted Senate Plan, Texas State Senator Rodney Ellis explained in detail how the new boundaries eliminate the ability of minority citizens to elect their preferred candidates by submerging their votes within neighboring and predominantly Anglo districts:
The demolition of District 10 was achieved by cracking the African American and Hispanic voters into three other districts that share few, if any, common interests with the existing District’s minority coalition. The African American community in Fort Worth is “exported” into rural District 22 — an Anglo-controlled District that stretches over 120 miles south to Falls [County]. The Hispanic Ft. Worth North Side community is placed in Anglo suburban District 12, *164 based in Denton County, while the growing South side Hispanic population remains in the reconfigured majority Anglo District 10.
Defs.’ Ex. 375, at 3. We find that Senator Ellis’s testimony is well supported by the record. See also Defs.’ Ex. 134, Expert Witness Report of Dr. Allan J. Lichtman ¶ 12 [hereinafter Lichtman Rep.] (“The state legislature, in dismantling benchmark SD 10 cracked the politically cohesive and geographically concentrated Latino and African American communities and placed members of those communities in districts in which they have no opportunity to elect candidates of their choice or participate effectively in the political process.”).
Texas does not deny this disparate impact, but responds that its decision to “crack” SD 10 is best explained by partisan, not racial, goals. Tex. Post-Trial Br. 25. While this is a potentially plausible rationale, Arlington Heights instructs that “[determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,” and so we must “look to the other evidence.” 429 U.S. at 266, 97 S.Ct. 555.
These other factors do not support Texas’s case. The second factor is Texas’s history of discrimination, and as we discussed in our analysis of the Congressional Plan above, history is not on Texas’s side. The third considers the “specific sequence of events leading up to the challenged decision.” Id. at 267, 97 S.Ct. 555. The Senate’s principal mapdrawer and staff director of the Senate Redistricting Committee, Doug Davis (no relation to Senator Davis), began discussing draft maps of new Senate districts prior to the February 2011 release of official Census data by using projected population increases. Defs.’ Ex. 127, at 38-39. Once the 2011 general legislative session started in January, these maps were kept in an anteroom off the Senate floor, where many Republican members were taken individually by Chairman Seliger and Doug Davis to review the draft plans and provide input. See, e.g., Trial Tr. 39:15-25, Jan. 20, 2012 AM; Defs.’ Ex. 809, Dep. of Senator Judith Zaffirini 29:22-25, 30:1-19, Jan. 6, 2012. Senator Davis was consistently rebuffed when she asked to see the plans for SD 10, even as another senator told her that the proposed plan was “shredding” her district. Trial Tr. 38:2-8, 40:11-14, Jan. 20, 2012 AM. Senator Judith Zaffirini’s uncontroverted testimony shows that this scenario was not unique to Senator Davis, but reflected a larger pattern: every senator who represented an ability district was excluded from this informal map-drawing process and was not allowed into the anteroom to preview the maps. See Defs.’ Ex. 809, Dep. of Senator Judith Zaffirini 30:1-3. Indeed, none of the senators representing ability districts were shown their districts until forty-eight hours before the map was introduced in the Senate. See Defs.’ Ex. 129.
Texas offered conflicting testimony in response. Doug Davis testified that “we were not printing maps and giving them to members,” Trial Tr. 172:10-11, Jan. 17, 2012 PM, suggesting that at least part of this informal process that gave Republican senators opportunities to provide input into the plans did not occur. But Chairman Seliger, Davis’s boss, testified that he provided paper maps to at least three senators during this period, all of them Anglo. Trial Tr. 68:1-3, Jan. 24, 2012 AM. In any case, it is clear that senators who represented minority districts were left out of the process.[34]
*165 Our skepticism about the legislative process that created enacted SD 10 is further fueled by an email sent between staff members on the eve of the Senate Redistricting Committee’s markup of the proposed map. The ostensible purpose of the markup was to consider amendments to the proposed plan, but the email suggests a very different dynamic at work. David Hanna, a lawyer for the Texas Legislative Council, a nonpartisan agency that provides bill drafting and legislative research to the Texas legislature, sent an email to Doug Davis and Senate Parliamentarian Katrina Davis (Doug Davis’s wife). Hanna’s email responded to an earlier message Texas did not produce, but which concerned “preeook[ing]” the committee report, i.e., writing the report before the hearing had been held. Trial Tr. 71:23-25, 72:1-7, Jan. 24, 2012 AM. With a subject line titled, “pre-doing committee report,” Hanna’s email read:
No bueno. RedAppl [the redistricting software Texas used] time stamps everything when it assigns a plan. Doing [the Committee Report on] Thursday [May 12] would create [a] paper trail that some amendments were not going to be considered at all. Don’t think this is a good idea for preclearance. Best approach is to do it afterwards and we’ll go as fast as possible.
Defs.’ Ex. 359. Although the chairman of the redistricting committee, Kel Seliger, denied knowing of any advance decision to refuse to consider amendments, he acknowledged what is apparent from the email: the boundaries of the new Senate districts would be a fait accompli by the time of the markup and the committee did not intend to consider any amendments to the plan. Trial Tr. 71:3-25, 72:1-16, Jan. 24, 2012 AM. We agree with Chairman Seliger that, at a minimum, this email shows that a plan was in place, at least at the staff level, such that no new proposals or amendments to the district map would be entertained at the markup.
Arlington Heights instructs that “departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.”. 429 U.S. at 267, 97 S.Ct. 555. This factor focuses on comparing past redistricting cycles to the present one for anomalous behavior. The State held no field hearings after Census data was released and proposed plans were drawn, unlike the hearings that were held after such data was available in the past. Defs.’ Ex. 134, at 13. Additionally, Senator Zaffirini testified that she, a senator of a minority district, “had never had less input into the drawing of any [redistricting] map” in over thirty years of redistricting experience,” Defs.’ Ex. 370, at 1, and that the 2010 redistricting process was the “least collaborative and most exclusive” she had ever experienced. Lichtman Rep. app. 7, Decl. of Senator Judith Zaffirini ¶ 3. We find this unchallenged testimony sufficient to conclude that the 2010 redistricting process was markedly different from previous years.
Finally, Arlington Heights states that “the legislative or administrative history may be highly relevant especially where there are contemporary statements by members of the decisionmaking body.” 429 U.S. at 268, 97 S.Ct. 555. Aside from the “No Bueno” email described above, we have no evidence of contemporary statements by the majority members or their staff “concerning the purpose of the official action,” id. But that email indicates, at a minimum, that redistricting committee staff feared their actions might create the appearance of impropriety under section 5. *166 We do, however, have a statement published in the Senate journal from the eleven senators representing majority-minority districts and Senator Davis. They alleged that the fact they were shut out from the map-drawing process until just forty-eight hours before the map was introduced in the Senate showed that the Senate Plan had a “racially discriminatory purpose.” Defs.’ Ex. 129, at 3. Other senators also wrote directly to Chairman Seliger to express their “disappointment in the process used to develop the Senate redistricting plan” and the “exclu[sion] [of] elected representatives of minority citizens” from that process. Defs.’ Ex. 132, at 1. Although statements from the senators aggrieved by the process do not necessarily show that it was racially discriminatory, instead of merely partisan, they do indicate that the majority was aware during redistricting that several members were upset by the irregular process, yet chose not to address their concerns.
We conclude that Texas has not shown that the Senate Plan was enacted without discriminatory intent. Senator Davis and other Intervenors provided credible circumstantial evidence of the type called for by the Supreme Court in Arlington Heights, which, as a whole, indicates that an improper motive may have played a role in the map-drawing process. Rather than directly rebut this evidence, Texas asserts only that the legislature’s motivations were wholly partisan, untainted by considerations of race. We agree that a plan that impacts minority citizens more harshly than majority citizens is not necessarily at odds with section 5. But under the VRA and Arlington Heights, it is not enough for Texas to offer a plausible, nonracial explanation that is not grounded in the record. It must, at a minimum, respond to evidence that shows racial and ethnic motivation, which it has failed to do. See Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555 (“Absent a [clear pattern of discrimination] ... the Court must look to other [circumstantial] evidence.”). Here, Texas has made no real attempt to engage with the Arlington Heights factors, even though it concedes that the Senate Plan has a disparate impact on minority voters in SD 10. We find it telling that the legislature deviated from typical redistricting procedures and excluded minority voices from the process even as minority senators protested that section 5 was being run roughshod. One would expect a state that is as experienced with VRA litigation as Texas to have ensured that its redistricting process was beyond reproach. That Texas did not, and now fails to respond sufficiently to the parties’ evidence of discriminatory intent, compels us to conclude that the Senate Plan was enacted with discriminatory purpose as to SD 10.
V. State House Plan
A. Retrogression in the State House Plan
The United States and the Intervenors argue that the enacted House Plan retrogresses minority voting power by eliminating eight ability districts (House Districts (HDs) 26, 33, 35, 41, 106,117, 144, and 149) without creating any others. Texas acknowledges retrogression in HD 33, but argues the House Plan works no abridgement of minority voting rights in any of the other districts. Texas maintains that the loss of HD 33 is offset by the plan’s provision for at least one and as many as three new ability districts. We conclude that the enacted plan will have the effect of abridging minority voting rights in four ability districts — HDs 33, 35, 117, and 149 — and that Texas did not create any new ability districts to offset those losses. Consequently, we conclude that the enacted plan cannot be precleared. We first analyze each of the eight alleged ability districts before turning to the three alleged offset districts.
*167 1. Alleged Retrogressive Districts
a. State House District 33
Nueces County in southeastern Texas includes three State House districts in the benchmark plan. HDs 33 and 34 are entirely within the county; HD 32 partially so. Benchmark HD 33 comprises the core of Corpus Christi. HD 34 includes the western part of the county, and HD 32 covers much of the eastern portion and extends into other counties immediately north of Nueces County. The population of Nueces County grew at a slower rate than that of the rest of the State, so it was only entitled to 2.03 districts in the new map. Because the Texas Constitution mandates that any reapportionment of State House districts observe county lines where possible,[35] the House mapdrawers drew only two districts in Nueces County, choosing to eliminate Hispanie-majority HD 33. See Trial Tr. 146:21-147:10, Jan. 17, 2012 AM.
With an HCVAP of 60.4%, Pl.’s Ex. 13, at 13, and success electing the Hispanic candidate of choice in four out of the past five endogenous elections (with only a narrow victory by a Hispanic Republican in 2010 breaking this streak), Engstrom Suppl. Rep. 6 & n. 5, there is no question that benchmark HD 33 was a Hispanic ability district. Even Texas concedes that if we accept, as we have, the binary analysis instead of Dr. Alford’s statewide functional approach, benchmark HD 33 would be an ability district. Tex. Post-Trial Br. 13.
There is similarly little question that HD 33 is not an ability district in the enacted plan. The benchmark district’s population was redistributed to neighboring districts, and the new HD 33 was transplanted to two predominantly Anglo counties near Dallas. The new HCVAP is only 8.5%, Pl.’s Ex. 14, at 13, and no expert’s reconstituted election analysis shows any electoral victories for minority-preferred candidates. See, e.g., Alford Rep. 11 tbl.3b. At trial, Dr. Alford conceded that enacted HD 33 is not an ability district. Trial Tr. 99:16-18, Jan. 24, 2012 PM. The State also concedes that the binary approach supports this conclusion. Tex. Posh-Trial Br. 13. We thus conclude that HD 33 is a lost ability district,
b. State House District 35
The parties who address this district agree that enacted HD 35 in south Texas is not an ability district. They disagree whether it is an ability district in the benchmark plan. The United States argues that benchmark HD 35 is an ability district because, just as in HD 33, the minority-preferred candidate won four out of the last five endogenous elections, and the fifth was a close election where a Hispanic Republican won the seat from the incumbent Hispanic Democrat.[36] U.S. Posh-Trial Br. 5; see also Handley House Rep. 5. This track record of success is evidence that benchmark HD 35 is an ability district. Texas counters that the exogenous analysis tells a different story. The OAG 10 indicates that the district *168 performs for minority voters only half the time. See Alford Rep. 11 tbl.3b. The other experts’ analyses place its success rate even lower: the district performed for minority voters in just two of Dr. Handley’s five elections, and two of Dr. Engstrom’s seven. See Handley Rep. 5; Engstrom Chart.
Texas also argues that enacted HD 35 will perform much the same as benchmark HD 35. The district’s HCVAP drops only slightly, from 54.6% in the benchmark to 52.5% in the enacted plan, Pl.’s Exs. 13, at 13; 14, at 13, and the exogenous analyses show only minor changes between the plans. The analyses of Dr. Handley and the OAG 10 show a one election drop in effectiveness. Handley House Rep. 9; Alford Rep. 11 tbl.3b. Dr. Engstrom’s analysis, which weights recent elections more heavily, shows a one election increase. See Engstrom Chart. To Texas, all this suggests that there is no meaningful change in the district’s performance, and because all agree that enacted HD 35 is not an ability district, benchmark HD 35 must not be an ability district either.
While true that only minor changes were made between benchmark and enacted HD 35, we think the best reading of the record is that the benchmark district is one in which minorities usually, although not always, elect their preferred candidate. Hispanic voters constitute the majority of the district, albeit barely, and they have been successful in electing their preferred candidate in endogenous elections held between 2002 and 2008. We find this to be persuasive evidence that Hispanic voters have attained an ability to elect their preferred candidates in HD 35. Texas does not argue that endogenous results are misleading in this district, but instead repeats its general position that we should consider only exogenous election results. Tex. Post-Trial Br. 12. We have already rejected this argument. Exogenous analysis uses statewide and national elections to help determine political trends within a district. But by considering district-wide election results, endogenous analysis provides a more direct answer to the question posed by section 5: have minority voters shown an ability to elect their preferred candidates in that district? Because the exogenous results do not cut entirely against ability status — here, Texas’s own exogenous analysis shows a 50% benchmark success rate — and there is nothing in the record that calls into question the probative value of this district’s endogenous track record, we are confident that endogenous results accurately describe minority voting ability in the benchmark.
As to enacted HD 35, Texas has not presented any evidence that HD 35 remains an ability district or that it tried to preserve the district’s ability status, and its argument based on the small changes in exogenous election performance is insufficient to counter the evidence we do have supporting the conclusion of the United States’s expert that the district loses ability status. When a district is close to the ability-to-elect line, even minor changes can be significant. The low exogenous election results for the enacted district combined with HCVAP changes that push the district even closer to the majority line (52.5%) are not enough to show that the district will continue to perform for minority voters. We must conclude that the evidence Texas offers is not persuasive to meet its burden to show that the changes made to HD 35 will not have a retrogressive effect on minority voters.[37]
*169 c. State House District 41
All parties agree that benchmark HD 41 in south Texas’s Hidalgo County is a minority ability district. Texas argues that the district remains so in the enacted plan, and we agree.
The HCVAP in enacted HD 41 is 72.1%. PL’s Ex. 14, at 14. Although a decrease from 77.5% in the benchmark, PL’s Ex. 13, at 14, that percentage remains well above the 65% threshold we laid down in our summary judgment opinion as a presumption of ability status.[38] See Texas, 831 F.Supp.2d at 263 & n. 22. We agree that such a high Hispanic population density creates a strong presumption that HD 41 remains an ability district. Significantly, none of the experts thought that HD 41 lost ability status, a conclusion that both the OAG 10 and Dr. Engstrom’s analysis confirm. Alford Rep. 11 tbl.3b; Engstrom Chart.
The United States takes issue with the value of a bright-line test, especially in a district like HD 41 where the uncontested record shows that voters have faced serious and pervasive socioeconomic barriers that depress voter turnout. U.S. Post-Trial Br. 8-9. The United States also argues that we know very little about enacted HD 41, and what we do know — its high Hispanic population — is not enough for Texas to meet its burden to show no retrogression. The background for Texas’s approach to redrawing HD 41 centers on the decision of Representative Aaron Peña, the five-term incumbent in neighboring HD 40, to switch party affiliations from Democrat to Republican following the 2010 election. One of the mapdrawers’ goals during redistricting was to protect Rep. Peña’s chances of reelection. Trial Tr. 163:4-165:13, Jan. 17, 2012 AM. They decided that the best way to do this was to have Peña, in effect, switch districts with HD 41’s incumbent, and then cut out of the district some strong Democratic areas “to increase the Republican performance of [enacted HD 41].” Id. at 168:1-3. The result is an oddly shaped district full of sharp corners that has earned the nickname “Transformer,” both here and in the section 2 litigation. See id. at 42:4-5, Jan. 23, 2012 PM. Enacted HD 41 splits apart seventeen of the forty-two voter tabulation districts (VTDs)[39] in the district, Defs.’ Ex. 800, at 35, in an effort to bolster Republican voting strength. Trial Tr. 165:17-168:17, Jan. 17, 2012 AM.
Dr. Handley was unable to draw a conclusion whether enacted HD 41 remains an ability district because of these splits. Handley House Rep. 1 n. 1. Election performance data is only available at the VTD level and not at the more precise level of a city block. Reconstituted election analysis uses the political averages for an entire VTD to assess how a portion of a VTD will perform. See, e.g., Trial Tr. 74:25-78:21, Jan. 24, 2012 PM; id. at 11:7-13, 50:19-23, 74:10-75:13, Jan. 26, 2012 AM. The higher the number of VTD splits in a new district, the more inconclusive these predictions become. Here, where over 31% of the district’s population lives in split-VTD areas and where the mapdrawers’ stated goal *170 was to peel off from the district strong Democratic areas — suggesting that the general concerns about skewed exogenous results from political variance within split VTDs may be especially strong in this district — Dr. Handley concluded that the results of her exogenous analysis were not reliable forecasters of the district’s future voting strength. See Handley House Rep. 9-10.
We are not deaf to the concerns the United States raises, and we are skeptical of the State’s claim that high HCVAP is sufficient to prove continued ability status in light of the uncontested testimony that HD 41 was engineered to transform a reliable Democratic district into one that would elect a Republican instead. Nevertheless, we do not think the record calls into question enacted HD 41’s status as an ability district. Dr. Handley’s concerns would give us more pause were minority voting power less established, but we agree with the other experts that the shortcomings of reconstituted election analysis for enacted HD 41 are not enough to keep us from concluding the district does not retrogress. This is not a case in which the Hispanic population is close to the majority line, or even close to the supermajority 65% line we set out in our summary judgment opinion. Enacted HD 41 still has an HCVAP of 72.1%. We are hard pressed to find that minority voters lack an ability to elect in a district in which they comprise such a high percentage of the voting public. We need not decide whether the United States is correct that, in a rare case, 65% HCVAP may not be enough to ensure ability to elect, because in this case, 72.1% is.
Lastly, if Texas succeeded in its goal to create a Republican district, Rep. Peña’s success would require support from a sizable portion of the district’s Hispanic community. This suggests either that Rep. Peña would be the Hispanic candidate of choice, or that Hispanic voting cohesion would have broken, perhaps to the point where there would no longer be one Hispanic-preferred candidate. If the former, Rep. Peña’s victory would not be a mark against Hispanic ability to elect. If the latter, finding retrogression would cause us to discount the preferences of the district’s Hispanic Republican voters, which would put us at odds with section 5’s mandate. We conclude that HD 41 remains an ability district in the enacted plan,
d. State House District 117
As it does with regards to HD 41, Texas argues that the 63.8% HCVAP of southwestern San Antonio’s enacted HD 117, PL’s Ex. 14, at 16, satisfies our bright-line test for ability to elect. Yet as we have said, Texas misreads our summary judgment opinion. A minority voting population of 65% or higher, not 60%, is necessary to “essentially guarantee” ability to elect. Texas, 831 F.Supp.2d at 263. We thus use the multi-factored analysis to assess the status of this district without starting from a presumption of ability status.[40]
Benchmark HD 117’s protected status has not been seriously challenged, and we have been presented with no evidence indicating that the district does not perform for minority voters. Dr. Handley’s endogenous data shows the minority-preferred candidate won four of the five past elections, and only lost the fifth by a nar *171 row margin. Handley House Rep. 9. The exogenous data shows an ability district, too. See Alford Rep. 11 tbl.3b (five out of ten elections); Handley House Rep. 5 (three out of five elections); Engstrom Suppl. Rep. 6 (four out of seven elections).
As for enacted HD 117, Texas points out that the district’s boundaries remain essentially unchanged and notes that the district has been trending Republican in recent years. Considering only the five most recent elections in the OAG 10, exogenous results are the same for benchmark and enacted HD 117: minority-preferred candidates won only two out of five. See Tex. Post-Trial Br. 11-12; Alford Rep. 11 tbl.3. The United States, by contrast, argues that enacted HD 117 was purposely engineered to appear unchanged from the benchmark, but that the proposed boundaries actually decrease minority voter power. U.S. Post-Trial Br. 9-10.
We conclude that enacted HD 117 is no longer an ability district. Texas may be correct that minority voting power is beginning to weaken in the benchmark district, but it has not yet dropped below the ability-to-elect threshold. The exogenous data shows that changes made during redistricting, not shifting political trends, are responsible for enacted HD 117’s loss of ability status. The exogenous election analyses of all experts, including Texas’s, show that minority effectiveness decreases from the benchmark level, and all conclude that minority-preferred candidates carry HD 117 less than half the time. Alford Rep. 11 tbl.3 (two out of ten elections); Handley House Rep. 11 (one out of five elections); Engstrom Suppl. Rep. 8-9 (three out of seven elections).
The high Hispanic population in enacted HD 117 — HCVAP increases five percentage points from the benchmark to 63.8%, Pl.’s Exs. 13, at 16; 14, at 15 — could suggest that enacted HD 117 remains an ability district despite its meager exogenous results. Yet HCVAP numbers do not tell the full story. The district’s Spanish Surname Voter Registration (SSVR)[41] level is significantly lower at just 50.1%. PL’s Ex. 14, at 27. The record shows that the mapdrawers purposely drew HD 117 to keep the number of active Hispanic voters low so that the district would only appear to maintain its Hispanic voting strength, and that they succeeded.
The primary mapdrawer for the House Plan, Gerardo Interiano, testified that a “ground rule[]” for drawing HD 117 was to keep the SSVR level just above 50%. Trial Tr. 106:25-108:1, Jan. 25, 2012 PM. The mapdrawers accomplished this goal by placing in the new district areas with high Hispanic populations but lower voter turnout, while excluding from the district high-Hispanic, high-turnout areas. For example, the heavily Hispanic communities of Somerset and Whispering Winds, part of benchmark HD 118, are both very poor and have low voter turnout. See id. at 9:7-13:7, Jan. 24, 2012 PM; Defs.’ Ex. 363, Garza Dep. 40:8-42:25, Oct. 19, 2011. They were moved to HD 117 despite repeated requests from HD 118’s representative, Joe Farias, to keep the communities within his district. Trial Tr. 7:11-14, 14:2-15:3, Jan. 24, 2012 PM. Rep. Farias’s offer to “trade” an area in HD 118 with similar Hispanic population numbers in exchange for keeping Somerset and Whispering Winds in his district was rejected, and according to his unchallenged testimony, the only plausible reason for this refusal was that Hispanic voters in the region he offered to trade have much higher turnout rates than the voters in Somerset and *172 Whispering Winds. Id. at 14:19-17:23. Similarly, Interiano testified that Somerset was moved to HD 117 as a way to keep the district “above 50 percent [SSVR] and maintain [our] other goals in the district” — strengthening Representative John Garza’s chances at reelection. Id. at 107:7-11, Jan. 25, 2012 PM.
These incidents illustrate Texas’s overall approach in HD 117: Texas tried to draw a district that would look Hispanic, but perform for Anglos. According to the experts, that was the result achieved. We conclude that HD 117 is a lost ability district.[42]
e. State House District 149
HD 149 in Houston-area Harris County is an alleged coalition district composed of Asian-American, Black, and Hispanic voters. The 2010 Census shows that Harris County was entitled to twenty-four districts, not its current twenty-five, so HD 149 was selected for elimination. The legislature chose to draw the home of HD 149’s representative, Hubert Vo, into HD 137 so that Rep. Vo would be forced to run against Scott Hochberg, HD 137’s representative, in the next election. Defs.’ Ex. 352, Test, of Rogene Calvert, Trial Tr. 422:14-22, Perez, No ll-ev-360. Representatives Vo and Hochberg are the only Democrats in the county’s delegation. Benchmark HD 149’s population was redistributed to neighboring districts and enacted HD 149 was transplanted to an entirely different county in a different part of the state. The new district’s demographics shift dramatically from minority- to majority-Anglo. Pl.’s Exs. 13, at 17 (benchmark Anglo CVAP of 37.6%); 14, at 17 (enacted Anglo CVAP of 77.4%). There is, unsurprisingly, no dispute that enacted HD 149 is not an ability district. Our only task is to determine whether benchmark HD 149 is a coalition district protected under section 5. As discussed above, we have concluded that section 5 protects coalition districts when there is clear evidence both of cohesion among the coalition’s members and demonstrated electoral success. Here, we conclude that this standard has been met.
Rep. Vo is the minority candidate of choice and has won the last four endogenous elections in the district. Handley House Rep. 7 tbl.3. With such strong results, we would likely conclude that HD 149 is an ability district were there a single minority group in the district. But as we have already discussed, we must ask more when analyzing a claim that a coalition has created an ability district. There are four reasons why we conclude this endogenous success is persuasive evidence of the coalition’s demonstrated ability to elect.[43]
First, population demographics give HD 149 the potential to perform as a coalition *173 district. The district’s combined Asian-American, Black, and Hispanic CVAP is 61.3%. PL’s Ex. 13, at 17. This fact has limited value in assessing minority voting power without information such as voter turnout and cohesion statistics, but it does indicate that if the minority groups in the district came together, they would likely be able to elect their preferred candidate, potentially without any help from Anglo crossover voters.
Second, the record shows that all three minority groups in the district vote cohesively. Texas has not contested that the district’s minority communities vote cohesively in general elections. And although the parties did not provide racially polarized voting analysis or a breakdown of election returns for Rep. Vo’s races, the Texas OAG’s analysis shows that Hispanic and Black voters in HD 149 uniformly prefer the same candidates in general elections and that their preferences consistently diverge from those of the district’s Anglo voters. See Pl.’s Ex. 26, at 3557-60. We have no statistical evidence of Asian-American voting patterns in the record, but the testimony at trial, discussed in more detail below, reports broad, cohesive support for Rep. Vo among all three minority communities and especially within the Asian-American community.
Third, uncontroverted anecdotal evidence shows that a tripartite coalition of the Asian-American, Black, and Hispanic communities consistently elects its candidate of choice. HD 137’s Rep. Hochberg testified to the strength of the coalition, concluding that “[politically all three of [the minority] communities form a coalition, and the Asian community is the glue holding things together.” Defs.’ Ex. 738, Pre-Filed Direct Test, of Representative Scott Hochberg 13:12-13. Rogene Calvert, an associate of the Texas Asian American Redistricting Initiative, testified that Rep. Vo defeated a twenty-two year incumbent in 2004 on the strength of the district’s tri-ethnic coalition. Defs.’ Ex. 736, Pre-Filed Direct Test, of Rogene Calvert 11:3-16. The Asian-American community “really rallied behind Mr. Vo when he announced his candidacy” and “took a lot of pride in Vo’s candidacy,” to the point that many Asian-Americans came out to support him who had “never participated in elections.” Id. at 11:8-11. Furthermore, he “wouldn’t have had a chance of success if he hadn’t received support from the other minority communities in District 149,” including endorsements from both Black and Hispanic political groups, and the Asian-American, Hispanic, and Black communities “all worked together to elect Mr. Vo.” Id. at 11:11-23; see also Defs.’ Ex. 352, Trial Tr. 420:14-17, Test, of Rogene Calvert, Perez, No. ll-cv-360, (Calvert, testifying that she has “seen Asian-Americans elected to office and other candidates of our choice due to the fact that we can coalesce with other groups to elect those people”); Defs.’ Ex. 353, Trial Tr. 425:18-24, Test, of Sarah Winkler, Perez, No. ll-cv-360 (local school board member testifying that it is necessary to gain the support of all three minority groups to win office within HD 149). We find this testimony credible, and Texas has made no effort to dispute this evidence that the coalition is effective in local and district-wide elections.[44]
*174 Finally, the coalition has a track record of success, electing Rep. Vo in 2004 and in every election since. The tri-ethnic coalition has also had sustained success electing other local officials, such as school board and Houston City Council members. Defs.’ Ex. 736, Pre-Filed Direct Test, of Rogene Calvert 12:11-13:7. Although Texas points out that the district only performs in one of Dr. Handley’s five exogenous elections, Tex. Post-Trial Br. 13; see also Handley House Rep. 7 tbl.3, we do not find this persuasive. Texas’s expert did not provide general election exogenous analysis for this district; the only expert to do so is Dr. Handley, and she concluded that the endogenous results were more important for understanding voting patterns in the district. See Handley House Rep. 13 & n. 20. Especially when combined with evidence that the coalition has success electing other local officials, we agree with Dr. Handley that endogenous elections, which speak to the ability of a particular voting community to coalesce around candidates for local office, are the best evidence of this coalition district’s success. Unlike the facts of SD 10, here we have evidence of both concerted efforts among a coalition to elect its preferred candidates and a pattern of success extending across multiple election cycles.
Texas’s primary objection to this approach is to argue that the minority groups in HD 149 do not vote cohesively in primaries and only come together to agree on a second- or third-best candidate in time for the general election. In Texas’s view, this does not prove an effective coalition district. Tex. Post-Trial Br. 9-10, 12-13; see also Alford Rep. 19-21 (explaining his analysis showing that Asian-American, Black, and Hispanic voters in HD 149 do not vote cohesively at the primary level). We agree that evidence of shared voting preferences at the primary level would be powerful evidence of a working coalition, but it is not needed to prove cohesion. In the first place, there is little support for Texas’s focus on primary elections. Texas cites LULAC for this point, but LULAC, a section 2 case, only talks about primaries as a method to determine one minority group’s candidate of choice; it says nothing about the need for two groups in a putative coalition to vote cohesively in a primary. See 548 U.S. at 444, 126 S.Ct. 2594. More importantly, it does not hold that evidence of cohesion in a primary is necessary to identify a candidate of choice. Id. (stating that without a contested primary there was “no obvious benchmark” to determine the minority-preferred candidate, and that the district court could draw multiple reasonable inferences from this lack of primary-level evidence). The same is true here, where there has been no contested endogenous Democratic primary since 2004, when Rep. Vo first won his seat. Texas also cites two district court cases that rely on primary cohesion, Rodriguez v. Pataki, 308 F.Supp.2d 346, 421 (S.D.N.Y.2004); and Session v. Perry, 298 F.Supp.2d 451, 478 (E.D.Tex.2004), but these cases represent the minority view. Most courts to address this issue have expressed no preference about the election level at which voting cohesion must be shown. See, e.g., Lewis v. Alamance Cnty., 99 F.3d 600, 615 (4th Cir.1996); LULAC, Council No. 4434 v. Clements, 999 F.2d 831, 886 (5th Cir.1993) (en banc); Bridgeport Coal. for Fair Representation v. City of Bridgeport, 26 F.3d 271, 276 (2d Cir.1994), vacated and remanded on other grounds, 512 U.S. 1283, 115 S.Ct. 35, 129 L.Ed.2d 931 (1994).
We agree with the majority view. Courts regularly consider general election data to demonstrate voter cohesion in traditional majority-minority districts, without any indication that such a showing is insufficient without evidence of voter cohesion in the primary as well. See, e.g., Thornburg v. Gingles, 478 U.S. 30, 58-59, *175 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); Old Person v. Cooney, 280 F.3d 1113, 1121 (9th Cir.2000). Additionally, requiring cohesion in the primary election distorts the role of the primary. Although minority groups sometimes coalesce around a candidate at that point in time, minority voters, like any other voters, use the primary to help develop their preferences. We refuse to penalize minority voters for acting like other groups in a political party who do not coalesce around a candidate until the race is on for the general election. See Alamance Cnty., 99 F.3d at 614-16 (‘We reject the proposition that success of a minority-preferred candidate in a general election is entitled to less weight when a candidate with far greater minority support was defeated in the primary.... [S]ueh a view is grounded in the belief that minority voters essentially take their marbles and go home whenever the candidate whom they prefer most in the primary does not prevail, a belief about minority voters that we do not share.” (citation and internal quotation marks omitted)). “Pull, haul, and trade” describes the task of minority and majority voters alike, and candidates may be minority “candidates of choice” even if they do not “represent perfection to every minority voter.” De Grandy, 512 U.S. at 1020, 114 S.Ct. 2647.
We are persuaded the record establishes that benchmark HD 149 is a coalition district protected under section 5. The Asian-American, Black, and Hispanic voters in the district work together to support their preferred candidates, and they have a multi-year record of success. Benchmark HD 149 is a protected ability district, and Texas’s decision to dismantle it without offsetting the loss elsewhere is retrogressive,
f. State House Districts 26, 106, and 144
Various Intervenors have argued that HDs 26, 106, and 144 are also lost ability districts. We disagree. For two of the districts, HDs 26 and 106, the only evidence presented shows that neither is a majority-minority district and both are currently represented by Anglo Republicans. See Pl.’s Ex. 13, at 13, 16. Other than scant assertions about one endogenous election in which the Anglo Republican candidate won by a narrow margin and reputed exogenous success since 2008, see Texas Legislative Black Caucus Post-Trial Br. 3-7, the parties have offered no election performance data or reconstituted election analysis. We cannot make findings of minority voting ability based on this thin record. At best, the evidence may show that the districts are beginning to favor minority-preferred candidates, but section 5’s effect prong protects only existing, not emerging, ability districts. See Texas, 831 F.Supp.2d at 264-65.
Similarly, HD 144 is not a majority-minority district and is represented by an Anglo Republican. PL’s Ex. 13, at 17. Both Dr. Handley’s and Dr. Engstrom’s exogenous election analyses show no victories for minority-preferred candidates in this district. See Handley House Rep. 5; Engstrom Chart. We find that benchmark HD 144 is not an ability district.
2. Alleged New Ability Districts
Texas argues that the legislature created as many as three new ability districts, which offset the loss of any that might have been eliminated in the enacted plan. But the enacted plan does not draw any new ability districts. It only strengthens minority voting power in some districts that have already achieved the ability to elect. As we have already discussed, strengthening ability districts cannot salvage a retrogressive plan. A state may not offset the elimination of an ability district by “packing” additional minority voters into a district that already performs. What the State calls offsets are actually *176 existing ability districts, and they do not compensate for the loss of others.
During the course of this litigation, Texas has offered three different explanations for how the enacted plan creates new Hispanic ability districts. At summary judgment, Texas identified HD 148 in the Houston area as a new ability district. Mot. Summ. J. ¶ 11. At trial, Texas’s chief witness for the House Plan testified that he believed strengthening the SSVR percentages in HD 148 and Tarrant County’s HD 90 compensated for the loss of HD 33. Trial Tr. 11:24-12:6, Jan. 17, 2012 PM. And at closing arguments and in post-trial briefing, Texas appears to abandon these claims, shifting instead to the altogether new argument that enacted HD 74 in western Texas is a new ability district. Tex. Post-Trial Br. 13-14.
Texas’s decision no longer to rely on HDs 90 and 148 was sound. Although an initial examination of the demographic data shows that both districts are more strongly Hispanic in the enacted plan,[45] all the experts’ election analyses show that both are already ability districts. Both achieved a perfect score under Dr. Handley’s endogenous election analysis, Handley House Rep. 5 tbl.l, and no expert’s exogenous analysis shows any change between the performance of the benchmark and enacted districts. See Alford Rep. app. B; Handley House Rep. 5 tbl.l, 11 tbl.3; Engstrom Chart. Increasing the size of their minority populations had no impact on these districts for purposes of section 5’s effect prong.
Whether enacted HD 74 is a new ability district is a closer call, but we conclude it is not.[46] With an HCVAP of 69.4%, Pl.’s Ex. 14, at 15, all parties agree that enacted HD 74 is an ability district; the question is whether benchmark HD 74 is as well. Yet the rest of the evidence shows that, as with HDs 90 and 148, the district’s demographic changes only strengthen an already-performing minority district.
Benchmark HD 74 is majority-Hispanic, with an HCVAP of 59.7%. Pl.’s Ex. 13, at 14. Representative Pete Gallego, the Hispanic candidate of choice, has represented the district since 1990. Although Texas now argues that benchmark HD 74 is not an ability district, key players during redistricting believed it was. See Trial Tr. 25:5-22, Jan. 17, 2012 PM (Interiano, testifying that he identified HD 74 as a protected district at the outset of the redistricting process); Defs.’ Exs. 214, 215, 820 (memoranda from Texas Legislative Council attorney David Hanna identifying benchmark HD 74 as a protected district). With a majority-Hispanic population, twenty-two years of success electing the minority-preferred candidate, and apparently little doubt by anyone that the district was protected until late in the litigation process, it seems clear that HD 74 does not need the new boundaries of the enacted plan to perform for minority voters.
In response, Texas points to the exogenous election analyses that paint a weaker picture of minority success. See Alford Rep. 11 tbl.3b (reporting minority victories in four of the OAG 10 elections); Handley House Rep. 5 tbl.l (one out of five victories). But see Engstrom Chart (four out of seven victories). Texas argues that the endogenous results reflect only the fact that Rep. Gallego has held office in HD 74 *177 for over two decades. According to Texas, that is insufficient evidence that HD 74 is an ability district. Tex. Post-Trial Br. 13-14.
We are not persuaded. As discussed above, endogenous elections are the best indication of ability to elect. What a minority community actually does in a specific district on election day is more powerful evidence than reconstituted statewide results of its ability — or lack thereof — to elect a preferred candidate. To be sure, Rep. Gallego’s success is almost certainly attributable, in part, to the considerable advantages of incumbency. But Texas asks us to discount a long history of endogenous success without providing evidence that incumbency is the predominant reason the minority community is able to elect Rep. Gallego. We decline to speculate with Texas that this rationale, instead of, for example, a large Hispanic community of interest with a mobilized voter base, accounts for the district’s long history of electing the Hispanic-preferred candidate. Texas has failed to show that the minority community has reelected Rep. Gallego multiple times despite lacking an ability to elect.
Moreover, we reject the premise that incumbency advantage is a mark against ability to elect. The minority community need not elect a different candidate in successive terms to prove continuing ability to elect. As we emphasized in our summary judgment opinion, analyzing ability to elect includes considering all relevant factors. Texas, 831 F.Supp.2d at 260. Incumbency can be a tool that a minority community, like any other group of voters, uses to enhance its electoral power. We are sensitive to Texas’s concern that incumbency advantage could, at times, give a “false positive” for ability status, but we conclude that the best solution is to consider the record as a whole, not to exclude probative evidence. We are persuaded that what has happened on the ground in HD 74 for over two decades — the consistent reelection of Rep. Gallego — reflects the reality of established minority voting power. We thus conclude that HD 74 is an ability district in the benchmark plan, and that Texas’s attempt to add Hispanic voters to the district cannot be used to offset the loss of ability districts elsewhere.[47]
B. Discriminatory Intent in the State House Plan
Because of the retrogressive effect of the State House Plan on minority voters, we do not reach whether the Plan was drawn with discriminatory purpose. But we note record evidence that causes concern. First, the process for drawing the House Plan showed little attention to, training on, or concern for the VRA. See, e.g., Trial Tr. 61:1-66:23, Jan. 20, 2012 PM. And despite the dramatic population growth in the State’s Hispanic population that was concentrated primarily in three *178 geographic areas, Texas failed to create any new minority ability districts among 150 relatively small House districts.
These concerns are exacerbated by the evidence we received about the process that led to enacted HD 117. As detailed above, the mapdrawers modified HD 117 so that it would elect the Anglo-preferred candidate yet would look like a Hispanic ability district on paper. They accomplished this by switching high-turnout for low-turnout Hispanic voters, hoping to keep the SSVR level just high enough to pass muster under the VRA while changing the district into one that performed for Anglo voters. This testimony is concerning because it shows a deliberate, race-conscious method to manipulate not simply the Democratic vote but, more specifically, the Hispanic vote.
Finally, the incredible testimony of the lead House mapdrawer reinforces evidence suggesting mapdrawers cracked VTDs along racial lines to dilute minority voting power. Texas made Interiano’s testimony the cornerstone of its case on purpose in the House Plan. Trial Tr. 45:22-25, Jan. 17, 2012 AM (“[0]ur [discriminatory purpose] case rests largely on the credibility of one person. His name is Gerardo Interiano.”). Interiano spent close to a thousand hours — the equivalent of six months of full-time work — training on the computer program Texas used for redistricting, id. at 131:3-5, yet testified that he did not know about the program’s help function, id. at 85:18-25, Jan. 25, 2012 PM, or of its capability to display racial data at the census block level, id. at 93:13-19, Jan. 17, 2012 PM. As unequivocally demonstrated at trial, this information was readily apparent to even a casual user, let alone one as experienced as Interiano. See id. at OSA-IS; id. at 88:5-89:17, Jan. 25, 2012 PM. The implausibility of Interiano’s professed ignorance of these functions suggests that Texas had something to hide in the way it used racial data to draw district lines. The data about which Interiano claimed ignorance could have allowed him to split voting precincts along racial (but not political) lines in precisely the manner the United States and the Intervenors allege occurred.
This and other record evidence may support a finding of discriminatory purpose in enacting the State House Plan. Although we need not reach this issue, at minimum, the full record strongly suggests that the retrogressive effect we have found may not have been accidental.
VI. Conclusion
We conclude that Texas has not met its burden to show that the U.S. Congressional and State House Plans will not have a retrogressive effect, and that the U.S. Congressional and State Senate Plans were not enacted with discriminatory purpose. Accordingly, we deny Texas declaratory relief. Texas has failed to carry its burden that Plans C185, S148, and H283 do not have the purpose or effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group under section 5 of the Voting Rights Act.
Opinion for the Court filed by Circuit Judge GRIFFITH, in which District Judge HOWELL joins and District Judge COLLYER joins all except section III.A.3. Separate opinion for the Court with respect to retrogression in Congressional District 25 filed by District Judge HOWELL, in which District Judge COLLYER joins.
Dissenting opinion with respect to retrogression in Congressional District 25 filed by Circuit Judge GRIFFITH.
Appendix filed by District Judges COLLYER and HOWELL, in which Circuit Judge GRIFFITH joins.
*179 Separate opinion for the Court with respect to retrogression in Congressional District 25 by HOWELL, District Judge:
The enacted Congressional Plan abridges the ability of minorities to elect their candidates of choice, and thus cannot be precleared under Section 5 of the VRA. As explained below, CD 25 was among the districts that provided minorities the ability to elect their candidates of choice in the Benchmark Plan, and is therefore protected under the VRA. The elimination of this district, without a corresponding offset, was retrogressive.
All parties agree that CD 25 in the enacted plan is not an ability district. They disagree, however, whether Benchmark CD 25 is a protected crossover district. Texas, the United States,[1] and one defendant-intervenor claim that it is not; the remaining intervenors argue that it is. As discussed above, we reaffirm the conclusion reached in our summary judgment opinion that crossover districts are protected under Section 5, and that proving their existence requires “more exacting evidence than would be needed to prove the existence of a majority-minority district,” with “discrete data, by way of election returns, to confirm the existence of a voting coalition’s electoral power.” Texas v. United States, 831 F.Supp.2d 244, 268 (D.D.C.2011). We conclude that the record before the Court demonstrates that minority voters are politically cohesive, have a demonstrated history of electoral success, and effectively exert their political power within the coalition that elects minority preferred candidates in CD 25. The district is therefore a protected ability district in the Benchmark that was lost in the enacted plan.
In the Benchmark Plan, CD 25 draws a majority of its population from South Austin in Travis County, but also includes seven counties southeast of Austin. The total population in the district is 49.8% Anglo, 38.8% Hispanic, and 8.7% Black. Pl.’s Ex. 11. Anglos constitute 63.1% of the CVAP in CD 25 while Hispanics make up 25.3% and Blacks 9.1%. Id. If Anglos voted cohesively in CD 25, they could elect their preferred candidate in every election, and the district would be beyond the ambit of Section 5. The Anglo vote in CD 25 is split, however; as many as half of Anglo voters cross over to vote with Hispanics and Blacks to elect Democratic candidates (a much greater crossover percentage than the statewide average of approximately 25%). See Defs.’ Ex. 578 (Trial Tr. 1120-21, Perez v. Perry, Sept. 10, 2011). In contrast, the Hispanic and Black voters of CD 25 overwhelmingly vote cohesively for the Democratic candidates. Defs.’ Ex. 724 (Ansolabehere Rebuttal Report to the Supplemental Report of Dr. John Alford, Attach. 3) (“Ansolabehere Reb. Rep.”). For instance, in the 2008 and 2010 congressional elections, 100% of Black voters cast ballots for Congressman Lloyd Doggett, as did over 80% of Hispanic voters. Id. Anglo support for Congressman Doggett, however, has varied considerably. In 2008, he received 53% of the Anglo vote, but Anglo support dropped to 37% in the 2010 election. Id. The dominant political force in CD 25 is thus described by some as a “tri-ethnic coalition” composed of almost all the district’s Black and Hispanic voters, and up to half, but as little as 37%, *180 of Anglo crossover voters. See, e.g., Trial Tr. 84-86, Jan. 19, 2012 PM (Dukes); Ansolabehere Reb. Rep., Attach. 3.
To determine if a crossover district is protected under Section 5, the Court must assess whether minority voters (1) vote cohesively and (2) successfully elect their preferred candidate by effectively exerting their political power within the voting coalition.[2]
The parties do not dispute that minorities in CD 25 combine with some Anglo voters to form a “tri-ethnic coalition,” that this coalition votes cohesively in general elections, and that the coalition has had considerable success in electing minorities’ candidates of choice.[3] For example, despite the fact that Anglos comprise 63.1% of the citizen voting age population, “the candidate preferred by Blacks and Hispanics [in CD 25] has won every Congressional election this decade.” Ansolabehere Reb. Rep., at 5; PL’s Ex. 11. Indeed, Texas’s own expert agreed that Benchmark CD 25 is a district in which minorities have the ability to elect the candidates *181 of their choice in general elections.[4] Trial Tr. 21-22, Jan. 25, 2012 AM (Alford); see also Alford Dep. 181-82, Jan. 22, 2012.
Given that there is no dispute that CD 25’s tri-ethnic coalition votes cohesively and has had considerable and proven success in general elections, the only remaining question before the Court is whether minorities in CD 25 exert their political power effectively in the tri-ethnic coalition, or are rather just “hangers-on” to the choices of Anglo voters.
A. Minority Groups Effectively Exert Political Power Within the Tri-Ethnic Coalition that Elects Minority Preferred Candidates in CD 25
Texas argues that minorities succeed in CD 25 because Anglos do not vote as a racial bloc and some Anglos happen to vote for Democratic candidates, who are preferred by minorities. See Texas Posh-Trial Brief, ECF No. 201, at 16 (stating that “[t]he demographics for the district show why” CD 25 is not a protected district and arguing that it performs for minorities because it is a “reliable Democratic district”). Texas’s expert, while agreeing that minorities in Benchmark CD 25 have the ability to elect the candidates of their choice, similarly asserts that the sole cause of the minority groups’ undisputed success is the partisan makeup of the Anglo population in the district. See Pl.’s Ex. 175, at 26-27 (Alford Pre-Filed Direct Testimony) (stating that “the key factor at work is partisanship”); Defs.’ Ex. 319, Alford Report, at 2 (“Because these ‘tri-ethnic’ coalitions are driven by partisanship, they cannot be easily disentangled from partisanship .... ”). According to this argument, minority voters in CD 25 are subject to the whims of Anglo Democrats and have no effective voice in the electoral process.
This argument is untenable for two reasons. First, the fact that a number of Anglo voters share the same political party as minority voters does not remove those minority voters from the protections of the VRA. The statute makes clear that this Court must focus on whether minorities are able to elect the candidate of their choice, no matter the political party that may benefit. Second, as detailed below, the record does not support Texas’s argument concerning the political dynamics in CD 25. Both factual and expert testimony establish that Anglos do not control the election outcomes in CD 25 and that power is shared equally among Hispanics, Blacks, and Anglos in this district, giving minority voters the ability to elect their preferred candidates.[5]
*182 The record demonstrates that no single group in CD 25’s tri-ethnic coalition is sufficiently numerous to elect its candidate alone, but together the coalition consistently wins general elections in the district. Contrary to the assertion that Anglo Democrats control the district, evidence shows that candidates supported by the minority groups within the tri-ethnic coalition are the ones who win. Trial Tr. 104, Jan. 19, 2012 PM (Dukes). For example, Texas State House Representative Dawnna Dukes testified that candidates are not able to bypass minority voters, and candidates who only obtain endorsements from Anglo groups in the tri-ethnic coalition do not win elections. Id. at 106 (Rep. Dukes testifying that “... in general elections in Travis County [] if you do not win the Hispanic and African-American boxes that are largely located in the central portion of Travis County, then you are not going to win an election in Travis County without the progressive Anglo Black and Hispanic communities. I may not have an Excel spreadsheet, but I can tell you I know my county.”).
Representative Dukes provided specific examples of elections to support her analysis of minority groups’ voting power in CD 25. She recalled the 2008 election for Travis County Tax Assessor, in which the African-American supported by the coalition successfully defeated, with 74% of the vote, an Anglo male “progressive Democrat.” Id. at 112. Before the Court is similar testimony from David Escamilla, the Travis County Attorney, regarding the power of minority voters in the tri-ethnic coalition. See Defs.’ Ex. 735 (Pre-Filed Direct Testimony of David Escamilla). Mr. Escamilla not only echoed Representative Dukes’ testimony that Anglos do not control the election outcomes in the triethnic coalition, but also provided the example of a race in 2008 in which an Anglo Assistant County Attorney lost a race for a county judgeship despite having “the lion’s share of endorsements from the local Democratic clubs” because he was “unable to gain significant support from the Hispanic or African American community.” Id. at 9-10.
The evidence presented to the Court regarding the power of minority voters in *183 the tri-ethnic coalition is persuasive, particularly because it is corroborated by the expert analysis performed by Dr. Stephen Ansolabehere.[6] To assess the relative power of the groups comprising the triethnic coalition, Dr. Ansolabehere examined each groups’ success in Democratic primary elections in Travis County. In the 43 Travis County primaries he analyzed, the Anglo preferred candidate won only once without support from the Hispanic and Black communities.[7] Ansolabehere Reb. Rep., Attach. 6. On the other hand, minority preferred candidates won twelve elections without the support of Anglo voters. Id. While Texas — as well as the TLRTF — argues that Anglo Democrats control the tri-ethnic coalition and drown out minority voters, these election results belie that conclusion. To the contrary, Dr. Ansolabehere concludes that “[Booking across the different patterns of group coalitions reveals that no one group dominates the primary process. Power is shared very equally and in such a way that the racial groups succeed in nominating their preferred candidates 75 percent of the time.” Id. at 23. By way of example, in the 43 primaries Dr. Ansolabehere analyzed, Anglo voters backed the winner in 31 primaries; Hispanic voters backed the winner in 32 primaries; and Black voters backed the winner in 31 primaries. Id., Attach. 6.[8]
These statistics support the testimony presented to the Court that the tri-ethnic coalition consistently elects candidates in the Democratic primary that appeal to the minority voters in the tri-ethnic coalition. Mr. Escamilla effectively described the political cohesion and cooperation within the tri-ethnic coalition, which “consistently produces broad agreement to support individual candidates and slates of candidates. The high frequency of agreement on candidates among the organizations within the Coalition also stems from the fact that many individuals are members of more than one of the organizations. This overlap in membership promotes agreement on common slates of political candidates.” Defs.’ Ex. 735, at 7. Indeed, the evidence demonstrates that Anglos do not dominate the tri-ethnic coalition that successfully elects candidates in CD 25. Rather, the *184 record shows that the views and preferences of minority voters in the tri-ethnic coalition are not only necessary but, more importantly for Section 5 analysis, regularly prevail in the coalition’s selection of candidates. In our view, as noted, the triethnic crossover coalition at work in Benchmark CD 25 reflects equal power-sharing among the members of the coalition rather than domination by Anglo voters.
In addition to the anecdotal and expert evidence of the dynamics within the triethnic coalition, there is no greater evidence of the power of minority voters in CD 25 than the reelection of Congressman Doggett in 2010. In 2008, 53% of Anglo voters supported Congressman Doggett’s successful reelection campaign. In 2010, however, Congressman Doggett won reelection despite receiving only 37% of the Anglo vote because 100% of Blacks and 86% of Hispanics voted for him. Ansolabehere Reb. Rep., Attach. 3.[9] Thus, notwithstanding the fact that a large majority of Anglos voted against the minority preferred candidate, minority voters effectively exerted their political power (with the aid of a number of crossover Anglo voters) to elect the candidate of their choice.
Texas argues that minority success is solely due to the partisan makeup of the district, but the 2010 election alone refutes this conclusion. Indeed, despite Texas’s burden of proof, Texas supplies no evidence aside from demographic statistics to support its argument that minority voters do not have power in the tri-ethnic coalition nor does it supply evidence to undercut the intervenors’ argument that they do. The intervenors argue that minority voters’ repeated electoral success as well as the unrebutted factual and expert testimony regarding equal power-sharing among the groups comprising the tri-ethnic coalition is sufficient to establish that Benchmark CD 25 is a minority ability district. We agree.
B. Evidence Discrediting Minority Voting Power is Unpersuasive
Despite the success of minority voters in electing the candidates of their choice in CD 25, unrebutted testimony of elected officials from within this district, and expert evidence corroborating the political power of minority voters within the triethnic coalition, two arguments are asserted for support of the position that minority voters do not exert political power in Benchmark CD 25 and that this district is therefore not eligible for protection as an ability district. The United States also takes the position that Benchmark CD 25 is not a protected district, but does so on the belief that Section 5 does not apply to CD 25 because Anglo voting in the district is not characterized by racial polarization. Each of these arguments merits consideration.
First, the TLRTF discounts the expert evidence presented by Dr. Ansolabehere demonstrating the electoral success of minority voters and their power within the *185 tri-ethnic coalition because this evidence relies on information from Travis County, as opposed to all of the counties that comprise CD 25 in the Benchmark plan. TLRTF’s Resp. to the Ct.’s Order of Mar. 6, 2012, ECF No. 219, at 7.[10] We acknowledge that, as with other experts in this case, the analysis by Dr. Ansolabehere does not cover all possible useful data. Nonetheless, the Court finds evidence of the tri-ethnic coalition’s performance in Travis County probative of its analysis of whether minorities in CD 25 have the ability to elect the candidates of their choice. As an initial matter, there is only one endogenous election within CD 25 as a whole: the election for a representative to the U.S. Congress, which Congressman Doggett has won since the district’s initial formation. Thus, in order to measure the effectiveness and power of minorities in the tri-ethnic coalition that elects Congressman Doggett, one must necessarily look to the performance of the coalition in other political subdivisions, such as in Travis County. The portion of CD 25 that encompasses Travis County not only comprises a significant majority of the population of CD 25 (59.7%), but also contains a large majority of the district’s minority population (66%). See Pl.’s Ex. 11. The voting dynamics in the district’s most populous county have a significant impact on the voting dynamics in the rest of the district. The minority population’s other successes in Travis County are therefore significant in assessing its power and influence within the crossover coalition.[11]
Second, like Texas, the TLRTF contends that Benchmark CD 25 is not an ability district because Anglo voters dominate the electoral outcomes in CD 25. As the prior discussion reveals, this argument is factually wrong. It is also based upon faux data. In support of its view of the relative voting power of minority versus Anglo voters, the TLRTF cites two different sets of data supplied by the OAG: racially polarized voter turnout estimates and exogenous election results in statewide Democratic primaries. Prior to discussing the reliability of these datasets, the Court briefly reviews the peculiar manner in which the TLRTF first raised its arguments to the Court.
Over three weeks after trial and following submission of the parties’ proposed findings of fact and post-trial briefs, the TLRTF argued for the first time in an “advisory” that the Court should not count Benchmark CD 25 as a protected district because Anglo voters “dominate the Demo *186 cratic primary.”[12] Advisory of Def. Intervenor TLRTF, ECF No. 210, at 3; see also TLRTF Resp. to Gonzales Intervenors’ Brief Regarding CD 25, ECF No. 223, at 2 n. 3 (TLRTF concedes that prior to filing its advisory, this intervenor had “never previously ‘suggested] to the Court that CD 25 was not a minority ability district]!]’ ”). As support for its blanket statement that Anglos “dominate” Democratic primaries in CD 25, the TLRTF cited tables of exogenous election results from statewide primary and general elections in four years (2002, 2006, 2008 and 2010). Advisory of Def. Intervenor TLRTF, ECF No. 210, at 3 n. 10 (citing Defs.’ Exs. 437, 439-41). Since the tables of election results did not identify the minority candidates of choice, the exhibits did not corroborate TLRTF’s statement, prompting the Court to issue a Minute Order directing the TLRTF to provide a “fuller explication of its reasoning for and the evidence behind its conclusion.” Minute Order dated Mar. 6, 2012.
In response to the Court’s Order, the TLRTF argued for the first time that Anglos often cast a majority of votes in primary elections.[13] TLRTF’s Resp. to the Ct.’s Order of Mar. 6, 2012, ECF No. 219, at 13. The Court agrees with the remaining intervenors, however, that the data presented by the TLRTF to support this argument is not persuasive.[14]
According to the TLRTF and our dissenting colleague, the OAG turnout estimates for certain selected elections in four *187 elections cycles between 2002 and 2010 indicate that Anglo voters cast the majority of votes in both the Democratic primary and general elections in CD 25.[15] Id.; see also TLRTF Resp. to Gonzales Intervenors’ Brief Regarding CD 25, ECF No. 223, at 1-2 (arguing that “Anglo voter preferences drive the outcome of both the Primary and General Election”). These turnout estimates, however, were appropriately criticized by Dr. Alford because they are unreliable on their face. Dr. Alford explained:
... if you’ll take a quick look at the last two columns [of the data] I think you’ll agree with me there’s very little reason to put any faith in this particular analysis. I don’t put any faith in the analysis. I’ve not relied on the analysis. Precisely what you’re about to talk about here, because of a variety of technical things, we don’t need to discuss. I mean, look at the general election in 2004. This model estimated that the turnout was 26 percent. The actual turnout in the election was 40.8 percent. The error in this model is enormous, and it’s increased when we try to estimate the increase in categories. I don’t rely on this.
Trial Tr. 86-87, Jan. 24, 2012 PM (Alford). In other words, the predictions of voter turnout produced using the methodology employed by the OAG relied on assumptions that differed drastically from what occurred in real life. Dr. Alford’s comments pertained to the OAG turnout data for elections for the State House, but there is no indication that the OAG’s methodology differed when compiling data for congressional elections or that Texas’s expert’s views of the unreliability of this data would be any different for congressional elections. Indeed, examination of the turnout predictions for congressional elections reveals that the error rate Dr. Alford referenced is equally as large, if not greater, than in the State House portion of this dataset.[16]
For example, the statistical model used to produce the OAG turnout data projected that turnout in CD 25 in the 2010 general election was 74.6%, when the actual turnout was 31%. Pl.’s Ex. 24, at 577. In the 2008 general election, the OAG projected turnout was 100%, but the actual turnout was 48.6%. Id. In 2006, the OAG projected turnout was 65.7% when the actual turnout was 28.1%. Id. In short, the projected congressional turnout data contains enormous error rates, similar to that found in the turnout estimates for the *188 State House, and is subject to the same criticism of unreliability.[17] Our dissenting colleague states that he relies on “different data” from the OAG than the one we discuss, but it appears that all of the OAG turnout projections were produced using the same methodology.[18] Dr. Alford stated that error rate in the “model” used by the OAG led him to completely disregard that data. Trial Tr. 86-87, Jan. 24, 2012 PM (Alford). Indeed, none of the experts in this case appeared to rely on OAG turnout projections, in any of its forms.[19] The dissent expends much energy attempting to demonstrate that the OAG turnout data could be accurate, and even “extrapolat[es][ ] missing turnout data” from Dr. Ansolabehere’s analysis as an alternative, but, quite frankly, our colleague’s own calculations of turnout data are defective.[20] While reliable and accurate data regarding voter turnout by racial group in Benchmark CD 25 would be highly probative, the Court is not presented with such evidence and will not endeavor to create its own.[21] Consequently, we do *189 not rely on such data and give neither the OAG turnout projections nor our colleague’s extrapolated calculations weight or further consideration. In its place, we rely on the most probative evidence presented to the Court: testimony from elected officials, endogenous election results, and expert analysis.
C. The United States’ Position that CD 25 is Not Protected because of the Absence of Racially Polarized Voting Among Anglo Voters is Incorrect
The United States does not argue that CD 25 is a protected district in the Benchmark Plan and has remained generally silent as Texas and the intervenors argue over the district’s status under Section 5. At closing argument, in response to a direct question posed by the Court, the United States clarified its position that while minority voters have an ability to elect the candidate of their choice in CD 25, it believes that CD 25 is not protected by Section 5 because Anglo voting in the district is not racially polarized. Trial Tr. 82-85, Jan. 81, 2012 AM.[22]
The Court is presented with four distinct positions regarding racial polarization in CD 25: The United States and certain intervenors posit that Anglo voters in CD 25 are not racially polarized, but that finding compels the government to conclude that no Section 5 protection applies,[23] while the intervenors reach the opposite conclusion. According to these intervenors, the lack of racially polarized voting among Anglos is irrelevant to the Court’s Section 5 analysis. See, e.g., Trial Tr. 34-35, Jan. 31, 2012 PM (Gonzales intervenors’ counsel acknowledging that voters in Travis County are “colorblind,” but stating that “[t]he only way the Voting Rights Act could not protect that district ... is if somehow, there had been a bailout.... In fact, Section 5 covers all of Texas as a matter of law, and so Travis County, CD 25, is covered, just like every other jurisdiction in Texas.”). By contrast to those two positions, the TLRTF argues that voting is polarized in all elections. TLRTF Resp. to Gonzales Intervenors’ Brief Regarding CD 25, ECF No. 223, at 10. Finally, Texas appears to take the position that Anglo voting is not racially polarized in general elections, but asserts that CD 25 *190 should not be protected because racial polarization is present among minority voters in Democratic primary elections. Trial Tr. 131-35, Jan. 19, 2012 PM. The Court need not determine which of these views is ultimately correct because, regardless, CD 25 is a protected district under Section 5.
The Court agrees with the Gonzales intervenors that Section 5 covers all of Texas as a matter of law and Travis County, including CD 25, is covered, just like every other jurisdiction in Texas. The position of the United States would have the anomalous consequence that once minorities successfully elect their candidates of choice in a cross-over district, Section 5 would no longer apply.[24] That is not the law. Such an ability district remains protected by the VRA and, if it is eliminated as an ability district, it must be offset, which CD 25 is not. This loss of Benchmark CD 25 as an ability district, without the creation of any new ability district, renders the enacted Congressional plan retrogressive.

. Texas sought declaratory judgment that the three plans comply with section 5 in counts two, three, and four of the complaint. In its first count, Texas also sought from this Court preclearance of its redistricting plan for the State Board of Education. No party objected to the plan, either in their written answers or during a conference call the Court held with the parties on September 21, 2011. With no opposition and satisfied that the State Board of Education plan complies with section 5, we granted preclearance for that plan on September 22, 2011. See Minute Entry Order, Sept. 22, 2011.

. This Court has granted Defendant-Intervenor status to seven parties, each of whom challenges various aspects of some or all of Texas's proposed plans in their capacities as individual voters, elected state representatives, or civil rights advocacy groups. The Davis Intervenors are Texas State senators and representatives from districts in the Fort Worth area. The Mexican American Legislative Caucus is a caucus in the Texas House of Representatives. The Gonzales Intervenors are a group of Hispanic and Black Texas voters. The Texas Legislative Black Caucus is composed of seventeen members of the Texas House of Representatives. The Texas Latino Redistricting Task Force is a group of Hispanic organizations focusing on redistricting and voter registration. The Texas State Conference of NAACP Branches and the League of United Latin American Citizens are civil rights and advocacy groups concerned with minority voting rights in Texas.

. Given the parties' unanimous desire to proceed quickly to trial but faced with scheduling constraints from the panel members' previously scheduled proceedings, the Court adopted a trial schedule in which all three judges heard evidence during the first four days of trial and two judges heard evidence the last four days, with the third judge reviewing the evidentiary record and transcript from those days. All three judges were present for closing arguments. The Court divided trial time so that Texas and the United States and the Intervenors would have equal time for argument when all three judges were physically present. No party raised an objection to these arrangements.

. The full record in this case runs many thousands of pages, including over a thousand exhibits introduced by the parties.

. Significantly, the State’s expert, Dr. John Alford, declined to offer an opinion on whether the enacted plans are retrogressive, even when this Court directly questioned him on the point. He testified that his analysis provided only the first steps in the more complicated inquiry this Court must undertake, refused to offer an opinion on the number of districts protected by section 5 in the existing and enacted plans, and stated he was not offering an answer to the question whether the enacted plans preserve the current degree of ability to elect. See Trial Tr. 63:21-67:10, 94:21-96:25, Jan. 24, 2012 PM. The State’s failure to produce testimony showing the enacted plans are not retrogressive may well be sufficient for us to find that Texas has not met its burden of proof under section 5. Nevertheless, because we find that the trial record is sufficient to show that the enacted plans cannot be precleared, this failing is not the only ground for our conclusions.

. All parties have agreed throughout this litigation that minority voters in Texas vote overwhelmingly Democratic, and thus there is generally no dispute about the identity of minority-preferred candidates in a given district. See, e.g., Trial Tr. 12:8-14, Jan. 17, 2012 AM (State's opening statement, noting that “in virtually all of the elections in fact, all of the elections you're going to hear about during this trial” the Hispanic-preferred candidate was the Democrat). In light of the parties’ agreement on this point, as a general matter we do not address the racially polarized voting data that makes this point. In the few districts in which there is a dispute over who is the candidate of choice of minority voters, discussed further below, we credit Dr. Handley’s assessment, which is based on her analysis of racial bloc voting in the districts.

. The OAG 10 includes one 2002 contest; two contests each from 2004, 2006, and 2008; and three contests from 2010. Dr. Alford's analysis includes results using all ten of these contests, and also using only the five most recent elections on this list. See Alford Rep. 8-9.

. Texas's reliance on the OAG 10 exogenous analysis is a litigation position; the record is clear that this functional election analysis played little to no role in the map-drawing process itself. The OAG did not identify which districts were protected in the benchmark plans or even how many benchmark ability districts existed. In fact, the only evidence that analysis was performed regarding these critical facts was testimony from the primary House mapdrawer, Gerardo Interiano, that he made an effort to identify Hispanic ability districts in the benchmark. Trial Tr. 25:5-26:10, Jan. 17, 2012 PM. Both Interiano and the other main mapdrawer, Ryan Downton, testified that they did not look at the OAG 10 analysis of the benchmark and enacted districts until their work was essentially complete. See id. at 57:17-25, Jan. 18, 2012 AM; Trial Tr. 14:51-52, Perez, No. 11-cv-360, Sept. 12, 2011. And there is no evidence that the legislators and mapdrawers made any modifications to the proposed district lines when they did consult the OAG 10 analysis late in the process.

. This observation is accurate, but we also note that the binary approach runs both ways: under a retrogression analysis, a State may not claim credit for strengthening an ability district, but neither is it penalized for reducing minority voting power in districts that are trending toward minority ability status but have not yet achieved it, as we discuss below with respect to HDs 26, 106, and 144.

. Because Texas has not raised the argument, we have no opportunity in this case to consider whether the federalism costs of preclearance, when weighed against current conditions, call into question the constitutionality of section 5’s remedial scheme. Cf. Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 202-05, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009) (noting the Court’s serious concerns that “current needs” may no longer justify the burdens preclearance imposes on covered jurisdictions). The constitutionality of section 5 was neither briefed nor argued to us, and we express no opinion on this significant point. In fact, our Circuit has recently held that section 5 is constitutional. See Shelby Cnty. v. Holder, 679 F.3d 848 (D.C.Cir.2012).

. Although the 2006 amendments rejected the portion of Georgia v. Ashcroft that directed courts to consider factors other than ability *148 to elect in their retrogression analyses, this passage is from the opinion's earlier section describing ability to elect.

.As we noted at summary judgment, Senator Kyi wrote separately a week after the passage of the amendments “to explain why [he] believe[d] that Congress cannot require that state or local governments create or retain influence or coalition districts,” S.Rep. No. 109-295, at 22 (additional views of Senator Kyi), but those individual views were filed a week after the VRA had passed both houses of Congress, were not considered by Congress prior to the vote, and were neither adopted nor affirmed by Congress in its findings accompanying the 2006 amendments. See Texas, 831 F.Supp.2d at 267 n. 30.

. In lower court section 2 cases, courts have also frequently referred to coalition and crossover districts using the same adjectives used to describe traditional majority-minority districts, such as "performing,” “effective,” and "ability.” See, e.g., Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm’n, 366 F.Supp.2d 887, 904 (D.Ariz.2005) (describing this trend).

. Bartlett’s holding was limited to crossover districts. It did not analyze coalition districts. See Bartlett, 556 U.S. at 13-14, 129 S.Ct. 1231.

. Texas suggests that the test for proving cohesion across a coalition requires proof that the coalition votes together in primaries, not just general elections. The TLRTF joins Texas's position in its post-trial submissions. See TLRTF Response to the Ct.'s Order of Mar. 6, 2012, at 9, ECF No. 219 (relying on Democratic primary results in Congressional District 25 as support for a conclusion that the district is not protected under section 5). As explained in our discussions of Congressional District 25 and House District 149 below, we reject this argument.

. The same concern exists in majority-minority ability districts. A minority group that has low election day turnout despite comprising a little over half of the district's voting age population may find itself consistently on the winning side in the district- while providing relatively few votes and little influence. Nevertheless, courts have generally presumed that success electing the minority-preferred candidate in a majority-minority district is sufficient to find ability status. That such a presumption is rebuttable illustrates that we are not requiring a different kind of proof for coalition and crossover districts, only more exacting evidence.

. As described further in our discussions of Congressional District 25 below, although the Court agrees on the general standard outlined above, we disagree on the appropriate test to determine when minority voters possess sufficient voting power to have established their ability to elect.

. While Texas ultimately bears the burden of proving nondiscrimination, it may shift that burden to the defendants by making out a prima facie case for nondiscrimination. See Bossier Parish Sch. Bd. v. Reno, 907 F.Supp. 434, 446 (D.D.C.1995), vacated on other grounds, 520 U.S. 471, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (noting that in section 5 cases "something like a burden shifting must occur in this, as in every other, civil case," and that once "[a jurisdiction] makes out its prima facie case, it is entitled to preclearance unless its prima facie case is rebutted”). After the defendants respond to the prima facie case, the issue becomes whether Texas’s "evidence is more persuasive than the evidence proffered against it.” Id.

. Texas argues that one of the two endogenous victories, the 2006 election, should be discounted because it did not occur on general election day. See Tex. Post-Trial Br. 16. VRA litigation left no time for a primary that year, and instead all eight candidates competed in a special election held the same day as Texas’s general election. See Trial Tr. 66:21-68:9, Jan. 26, 2012 AM. Texas is correct that the Republican candidate won the plurality of votes in the special election, but we find this result unremarkable because six of the eight special election candidates were Democrats. When the runoff election was held five weeks later, Hispanic-preferred candidate Ciro Rodriguez won a decisive victory. Pl.'s Ex. 17, at 368. We see no reason to discount Rep. Rodriguez’s victory.

. Judges Collyer and Howell do not depend on voter turnout data to conclude that CD 23 is a lost ability district.

. Having found retrogression in the Congressional Plan because CD 25 was an ability district that was eliminated and not replaced, Judge Collyer does not reach the further question of retrogression based on proportional representation arising from multiple new congressional seats and a sizeable growth in minority population.

. Likewise, minorities comprise 80.4% of the increase in Texas’s voting age population between 2000 and 2010. U.S. Req. for Judicial Notice ¶ 19 (citing 2000 and 2010 Census data). We agree with the United States that U.S. Census data is an appropriate subject of judicial notice. See id. at 2 (citing Hollinger v. Home State Mut. Ins. Co., 654 F.3d 564, 572-73 (5th Cir.2011); City of Port Arthur v. United States, 517 F.Supp. 987, 993 n. 5 (D.D.C.1981)).

. The Supreme Court has also described our task as determining that the enacted plan "is no more dilutive than what it replaces.” Bossier II, 528 U.S. at 335, 120 S.Ct. 866.

. We agree with the United States that the holding of Abrams cannot be read to govern all cases in which a state gains seats in a district map. At the extreme, consider a state with a 100-member legislature and 30 ability districts in the benchmark map. If the state redrew its legislature to double the number of districts to 200, but created no new ability districts, it would be difficult to conclude that the new plan was not dilutive and had not increased the degree of discrimination against minority voters merely because it contained the same number of ability districts.

. We note that we are rounding 2.7 up to 3. We do so following the Court’s example in LULAC, in which it noted that " 'rough proportionality’ must allow for some deviations.” 548 U.S. at 438, 126 S.Ct. 2594 (quoting De Grandy, 512 U.S. at 1023, 114 S.Ct. 2647).

. Our calculations use the combined Black and Hispanic share of the CVAP (39.3%), the metric advanced by the United States and various Intervenors. See also De Grandy, 512 U.S. at 1014 n. 11, 114 S.Ct. 2647 (" 'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members’ share of the relevant population.”). Nevertheless, we note that our method also yields one additional congressional seat if the Black and Hispanic representation gaps are calculated separately. Hispanics comprise 26.4% of Texas’s CVAP, Joint Stipulations of Fact ¶ 38, and the "Hispanic” representation gap increases by one in the enacted plan (Hispanics have seven ability districts in both plans, but 26.4% of 32 is 8.4 and 26.4% of 36 is 9.5). By contrast, Blacks comprise 12.9% of Texas's CVAP, id., and the “Black” representation gap does not change between plans. Blacks have three ability districts in both plans; 12.9% of 32 is 4.1, and 12.9% of 36 is 4.6. Following the "rough proportionality” principle, this increase of 0.5 in the representation gap does not require the State to draw a new district, just as we require the State to draw only one additional ability district above, even though there is a 1.5 increase in the representation gap.
Similarly, this representation gap would exist even if CD 25 were counted as an ability district in the benchmark. In that case, the benchmark representation gap would be two districts (the difference between 13 and 11 districts) and the enacted representation gap would be three districts (the difference between 14 and 11 districts).

. We note that this requirement would likely be subject to the caveat that a state is only required to draw a new district if possible, i.e.,-if it can draw a new ability district without violating other principles such as one-person, one-vote or the demands of section 2. Yet the facts that minority population growth was largely concentrated in three areas in Texas and that the parties submitted several alternate plans drawing a new Hispanic ability district suggest that this will not be an issue here. In any event, the infeasibility of drawing a new district was not argued or briefed in any depth during this litigation.

. Under our logic, if Texas had experienced the same population growth but had not gained additional congressional seats (be *159 cause, for example, other states experienced equivalent or greater growth), it would have been required to draw only 10 ability districts. It is the growth in the number of districts that triggers our analysis, not growth in the population.

. According to the 2010 Census, Texas's population was 25,145,561. If this population were divided equally between the State’s thirty-six congressional districts, each district would have 698,488 individuals. Pl.’s Ex. 12, at 2. Benchmark CD 9 has a surplus of 35,508 people, or 5.05% of the district's population. CD 18’s surplus is 22,503 (3.22%), and CD 30’s is 7,891 (1.14%). Defs.’ Ex. 347, at 28-29.

. Unlike in its arguments about retrogression, Texas never argued that the removal of district offices and economic generators was the product of political animus.

. The parties have provided more evidence of discriminatory intent than we have space, or need, to address here. Our silence on other arguments the parties raised, such as potential discriminatory intent in the selective drawing of CD 23 and failure to include a Hispanic ability district in the Dallas-Fort Worth metroplex, reflects only this, and not our views on the merits of these additional claims.

. Richard Cross, a libertarian candidate, received 2.6% of the vote (7,591 votes). PL's Ex. 31, at 14.

. We also note that Texas did not refute testimony indicating that the field hearings held prior to the start of the 2011 legislative session were “perfunctory,” Trial Tr. 94:20-21, Jan. 20, 2012 AM, and "a sham,” with low *165 attendance, low participation, and little invited testimony or prepared materials. Defs.' Ex. 809, Dep. of Senator Judith Zaffirini 7:11-21.

. Under the County Line Rule, Tex. Const. art. Ill, § 26, a district must be drawn to mirror a county's boundary lines if that county has sufficient population for a voting district. When the population of more than one county is needed to make up a single voting district, the Rule requires that contiguous counties be joined to form that district. Likewise, when the population of a county requires more than one voting district, the districts must be contained within the county lines and any excess population must be joined wholly with population from a neighboring county to form a district.

. We agree with Dr. Handley that Representative Jose Aliseda, who won in 2010 with only 22.3% of the Hispanic vote, is not the Hispanic candidate of choice. See Handley House Rep. app. D, at 34.

. This district presents a close and very difficult case. Presented with more or different evidence, we might conclude that the seemingly minor changes made to the district do not alter its ability status. Nevertheless, Congress has allocated the burden to prove lack of discriminatory effect to the State. On the *169 record before us, we conclude that Texas has not done so.

. Texas argues that our summary judgment opinion set out a 60%, not 65%, bright-line test. Tex. Post-Trial Br. 7 & n. 5, 11. We find this argument puzzling given that our previous opinion stated that "a minority voting majority of sixty-five percent (or more) essentially guarantees that ... a cohesive minority group will be able to elect its candidate of choice.” ft 263. Texas argues that most of the authorities we cited used a 60% voting age population bright line, but we cited these (nonbinding) cases only as examples of the ways other courts have approached this issue.

. In Texas, VTDs are roughly equivalent to precincts elsewhere.

. In its post-trial brief, Texas argues for the first time that enacted HD 117 satisfies the bright-line test as a coalition district because the Hispanic and Black communities comprise 68.4% of the district’s voting age population. Tex. Post-Trial Br. 11. We reject this new argument, especially because Texas has presented no evidence, such as election analysis or evidence of voting cohesiveness between the minority communities, to support a conclusion that HD 117 is a coalition district.

. SSVR is a metric used to approximate the number of registered Hispanic voters in a given geographic area. The list is compiled by comparing state voter registration records against a Census list of common Spanish surnames.

. Our conclusion that HD 117 is retrogressive may seem inconsistent with our conclusion regarding HD 41, given that HD 117’s HCVAP is only 1.2 percentage points below the 65% bright line. Yet there are significant differences between the two districts. First, HD 41’s HCVAP is eight points higher than that of HD 117, and eight points represents a significant difference in electoral power. Second, unlike HD 41, where no expert was willing to conclude that the district lost ability status, both Dr. Handley and Dr. Engstrom conclude HD 117 did. Handley House Rep. 11; Engstrom Suppl. Rep. 8-9. Finally, our concerns that finding HD 41 retrogressive would discount the choice of Hispanic Republicans is not an issue here. The evidence for HD 41 showed that the mapdrawers excluded Republican portions of the map; here it shows they excluded high-turnout portions. Selecting among Hispanic voters based on their political preferences may not raise a red flag under section 5, but selecting based on minority voters’ history of turnout, regardless of political preference, does.

. Our conclusion is consistent with Dr. Handley's assessment of the district. See Handley House Rep. 3, 7, 13.

. Although the Court agrees that this testimony is sufficient to conclude that the district is protected under section 5, it differs in its views of the strength of the evidence. Judge Griffith concludes that the testimony of Rep. Hochberg and Calvert shows that the Asian-American community leads the coalition and that the Black and Hispanic communities play a consistently supportive and vital role in its success. Judges Collyer and Howell need not reach the issue of leadership because they conclude that a tri-partite arrangement of equals is sufficient for protection under section 5.

. The HCVAP in proposed HD 90 increases from 47.9% to 49.7%, and SSVR from 47.2% to 50.1%. PL's Exs. 13, at 20; 14, at 20. HCVAP in proposed HD 148 increases from 42.1% to 51.4%, and SSVR from 40.0% to 50.0%. PL's Exs. 13. at 21: 14. at 21.

. We note that even if we agreed with Texas that enacted HD 74 is a new ability district, the enacted plan would still be retrogressive because the creation of one new ability district cannot offset the loss of several others.

. In a footnote in its post-trial briefing, Texas advances — for the first time — HD 101 as another potential offset district. Tex. Post-Trial Br. 14 n. 7. It argues that if this Court finds coalition districts are protected under section 5, as we have, then enacted HD 101 is a new coalition district because the combined Black, Hispanic, and Asian-American CVAP is 55.5% and the district is located in Democratic-leaning Tarrant County (and so, presumably, the minority community will have help from crossover Anglo voters). We stated at summary judgment that the lack of election returns to show that two or more distinct minority communities will coalesce around a preferred candidate makes it "extremely difficult to confirm that minority voters would indeed have the ability to elect” in a prospective coalition district. Texas, 831 F.Supp.2d at 268. Accordingly, we will not conclude, without evidence, that the minority groups in this new district will coalesce around the same candidates and turn out in sufficient numbers to elect them.

. The United States does not dispute that minority voters have the ability to elect their preferred candidate in CD 25, but explained that, in its view, Section 5 does not apply because racially polarized voting is not present due to the number of Anglo crossover votes. While, in dissent, our colleague correctly notes the government does "not argue that benchmark CD 25 is a protected district,” CD 25 Dissent, at 190 n. 1, the government’s underlying rationale for this position is based upon a restricted view of the protection provided by Section 5, which, as discussed infra, we reject.

. Although our dissenting colleague characterizes this test as "novel” and "divorced from Supreme Court precedent,” CD 25 Dissent, at 190, the test we outline above is no more novel than the application of any precedent to a unique set of facts, and fully comports with this panel's conclusion at summary judgment that crossover and coalition districts are protected by Section 5 of the VRA, Texas, 831 F.Supp.2d at 266-68, as well as our reading of the Supreme Court precedent regarding protected districts outlined in the Majority Opinion. Majority Op., at 146-51. Nevertheless, the dissent argues that the test we delineate "sweeps too wide because it provides no way to distinguish between unprotected influence districts, where minority voters play a substantial role, and protected crossover districts, in which they have an ability to elect.” CD 25 Dissent, at 191. The "unprotected influence districts” referenced by the dissent, however, are districts "where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process.” Georgia v. Ashcroft, 539 U.S. 461, 482, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003). In other words, minority voters in influence districts fall short of exercising sufficient power to be a protected district. By contrast, our inquiry under the test we apply focuses on whether minority voters are able to “successfully elect their preferred candidate by exerting their political power.” As we make clear, it is not enough that minorities exert political power. They must also be successful in electing the candidates of their choice. See LaRoque v. Holder, 650 F.3d 777, 793-94 (D.C.Cir.2011) ("Essentially overruling Georgia v. Ashcroft, Congress added subsections (b) and (d) to section 5, which make clear that the section 5 inquiry should focus on whether the proposed change 'has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color ... to elect their preferred candidates of choice.’ 42 U.S.C. § 1973c(b)”). As discussed below, and our dissenting colleague concedes, CD 25 Dissent, at 192 (stating that "... there is evidence that a coalition of Black, Hispanic, and some Anglo voters consistently elects minority-preferred candidates in CD25 ...."), it is undisputed that the triethnic coalition elected Congressman Doggett, the minority candidate of choice, in each of the past three elections.

. Given that Hispanic and Black voters in Benchmark CD 25 prefer the same candidate of choice in the general election, the Court considers these voters together for purposes of assessing minority voting power. See Majority Op., at 139-40 (stating that "[t]he goal of the 'effect' prong [of section 5] is ‘to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise,’ Beer v. United States, 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) ....”) (emphasis added). While the dissent queries whether such aggregation is permissible under Section 5, CD 25 Dissent, at 191 n. 2, this Court has already answered this question by confirming that coalitions formed by minority voters, who have united to elect their preferred candidate in a district, are protected under Section 5. Majority Op., at 146-50.

. Although our dissenting colleague faults us for citing Dr. Alford’s expert opinion regarding CD 25 because we reject his methodology, Texas bears the burden of proof and its only expert credibly opined, in disagreement with his own client, the State of Texas, that Benchmark CD 25 is a district in which minority voters are able to elect the candidates of their choice. The dissent states that because "Dr. Alford uses a metric ... we have emphatically rejected[J [tjhere is no reason that his assessment should be legally conclusive for this district, yet no other.” CD 25 Dissent, at 193 n. 5. There are two inaccuracies in this statement. First, Dr. Alford’s conclusion regarding Benchmark CD 25 was not based on his rejected metric, but upon the undisputed fact that the minority candidate of choice has won all endogenous elections in the district. Trial Tr. 21, Jan. 25, 2012 AM (Dr. Alford responding "yes” to the question: "You would agree ... that on the benchmark plan Congressional District 25 was a district in which Blacks and Hispanics were able to elect the candidates of their choice in general elections, correct?”). In fact, Dr. Alford testified that he did not even include CD 25 in his statewide functional analysis. Id. 21-22. Second, we do not deem Dr. Alford’s statement on CD 25 to be "legally conclusive,” which is why we discuss the law and evidence pertaining to CD 25 at length.

. Writing in dissent, our colleague argues that to draw "the line between protected crossover districts and non-protected districts that sim *182 ply vote Democratic,” a minority group "must lead” a crossover coalition and that "an equal voice” in a district’s electoral decisions is not enough. CD 25 Dissent, at 190-91, 191-92. For this reason, the dissent is critical of the testimony that "could support a conclusion that Anglos do not control CD 25, but [] doesn’t tell us anything more.” Id. at 193. This new "leadership” test sets down a hurdle for which we find no basis in the law or precedent and, consequently, to which we do not subscribe. Section 5 of the VRA protects "the ability of [minority voters] to elect their preferred candidates of choice.” 42 U.S.C. § 1973c(d). This text charges the Court, quite simply, with assessing whether minority voters are able effectively to elect their preferred candidates. The Supreme Court has never stated that minorities must "lead” a voting coalition, but rather that when minorities “pull, haul, and trade” to elect their preferred candidate, the district is one in which minority voters have an ability to elect and section 5’s safeguards apply. See Johnson v. De Grandy, 512 U.S. 997, 1020, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); see also Georgia v. Ashcroft, 539 U.S. 461, 481, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003). The Supreme Court’s oft-used description belies an interpretation of Section 5 that would require minority voters to “lead,” with the implication that they must eschew any "trade” or compromise in power sharing, even though such trading and compromise are a necessary part of the process in a political coalition. We decline to adopt a new "leadership test,” as outlined in the dissent, when the text of the statute and Supreme Court construction of the law provide no basis for the assertion that minorities are only able to elect their candidate of choice if they are "leaders,” as opposed to equal participants in the process of political coalition building.

. As discussed infra, Dr. Ansolabehere’s analysis could be more comprehensive. His findings are nonetheless probative of the voting dynamics within CD 25. Our dissenting colleague believes that some of Dr. Ansolabehere’s statistics result in "discrepancies,” CD 25 Dissent, at 194 n. 8, but our colleague’s deconstruction of Dr. Ansolabehere’s data has not been corroborated by any statistical expert. Regardless, even taking into account any alleged "discrepancies,” it is undisputed that Dr. Ansolabehere's data indicates that Congressman Doggett enjoys virtually unanimous support from Black voters and overwhelming support from Hispanic voters.

. These primary election results are cited only to assess the relative power among groups comprising a voting coalition, not to assess whether a voting coalition exists. See Majority Op., at 174-75 (noting that groups comprising a voting coalition need not vote cohesively at the primary level).

.A second expert also noted that voter turnout in primary elections is generally low in Travis County and CD 25, which effectively amplifies the preference of minority voters in Democratic primaries. He explained: ”[I]n the low-turnout Travis County and CD 25 primaries, minority voters vote almost exclusively in the Democratic election, while the Anglo majority in Travis County, and elsewhere in CD 25, splits its vote in the March partisan balloting. That means minority voters, especially in Travis County, combining with the minority of Anglos who remain in the Democratic primary, are very effective in determining the nominee of their party.” Murray Suppl. Rep., ECF No. 218, Ex. 1, at 1; see also id. at 5 ("Fewer and fewer Anglos vote in Democratic primaries in the 25th District.”).

. Most of the experts agree that such endogenous election results are the most probative evidence of whether a minority group or minority coalition has the ability to elect the candidate of choice. See, e.g., Defs.’ Ex. 794, at 3 (Handley Rebuttal Report) (”[T]he most essential piece of information in determining if a Benchmark district is a district that provides minority voters with the ability to elect their candidates of choice is whether minority voters have been successful at electing their preferred candidates to the legislative office at issue in the district.”); Defs.’ Ex. 327, at 4 (Handley Congressional Report); Defs.’ Ex. 724 (Ansolabehere Oct. 21, 2011 Report, at 31). While the retrogression expert proffered by Texas disagrees with reliance on endogenous election analysis, as noted previously, even he agreed that Benchmark CD 25 is a district in which minorities have the ability to elect the candidates of their choice. Trial Tr. 21-22, Jan. 25, 2012 AM (Alford).

. Our dissenting colleague also cites this focus on Travis County as a weakness in the expert analysis and testimony. CD 25 Dissent, at 181-83.

. No party, including Texas, presented any evidence regarding the tri-ethnic coalition’s performance in the six smaller counties wholly contained in Benchmark CD 25. Our colleague states that we are “mistaken” on this point, and writes that "[w]e received evidence indicating that the tri-ethnic coalition was ineffective in these counties in 2010.” CD 25 Dissent, at 193-94 n. 6. The exhibit to which he cites, however, is a 206-page table of election results, which indicates that the Democratic candidate lost in the elections he references. See id.; PL’s Ex. 34. This table and the election results our colleague discovered on the Internet, see CD 25 Dissent, at 193-94 n. 6, indicate that the other six counties wholly contained in Benchmark CD 25 vote overwhelmingly Republican. Id. (concluding, based on an analysis of aggregate data, that "the tri-ethnic coalition prevailed in only three of one hundred and twenty elections held in these counties in 2010”). This confirms that at least the majority of voters in these counties are not part of the tri-ethnic coalition, and thus do not affect the voting dynamics within the tri-ethnic coalition, which is the focus of our inquiry. It further indicates that the tri-ethnic coalition is able to prevail in endogenous elections in Benchmark CD 25 despite the fact that most of the voters in these six smaller counties do not vote for the minority preferred candidate.

. According to the other intervenors, when the U.S. District Court in the Western District of Texas initially adopted a congressional map that preserved CD 25, the TLRTF "defended that map in Texas’s appeal to the Supreme Court, never suggesting to the Court that CD 25 was not a minority-ability district....” Resp. of Certain Def. Intervenors to TLRTF’s Briefing Relating to CD 25, ECF No. 221, at 3.

. The TLRTF also urges the Court to look to a second OAG dataset of exogenous election results in CD 25 for statewide Democratic primaries, which the TLRTF interprets as showing that Hispanic candidates of choice only prevail in three out of nine primary elections. TLRTF's Resp. to the Ct.'s Order of Mar. 6, 2012, ECF No. 219 at 12-13; TLRTF's Resp. to Gonzales Intervenors’ Brief Regarding CD 25, ECF No. 223 at 13 ("Latino candidates won only three out of the nine Democratic Primary elections”) (emphasis in original). Other intervenors dispute the TLRTF's interpretation of this data and argue that the data shows that minority preferred candidates prevailed in "six of eight primaries.” Resp. of Certain Def. Intervenors to TLRTF's Briefing Relating to CD 25, ECF No. 221, at 5. Resolving this dispute, which the TLRTF raised for the first time in a post-trial brief, is unnecessary since the Court finds that exogenous primary evidence is not probative to assess whether a voting coalition exists or to measure the effectiveness of minority voters in CD 25. In any event, exogenous primary election results would not rebut the testimonial and expert evidence demonstrating that minority voters in CD 25 have fulfilled their "obligation to pull, haul, and trade to find common political ground” and achieve electoral success. Georgia v. Ashcroft, 539 U.S. at 481, 123 S.Ct. 2498 (quoting De Grandy, 512 U.S. at 1020, 114 S.Ct. 2647).

.The timing and weak evidentiary basis for TLRTF's belated "advisory” suggest that tactical considerations were at play. See generally Resp. of Certain Intervenors to TLRTF's Briefing Relating to CD 25, ECF No. 221, at 3 (implying that the "Task Force has now created that argument in an attempt to justify the deal it cut with Texas” in the interim map-drawing process in the U.S. District Court for the Western District of Texas). Indeed, the TLRTF uses this Court as a forum to contend that a new Latino-majority district in CD 35 in Central Texas may properly encompass portions of Travis County, a matter that is not at issue before this Court. Advisory of Def. Intervenor TLRTF, ECF No. 210, at 3; TLRTF's Resp. to the Ct.'s Order of Mar. 6, 2012, ECF No. 219, at 2. Whether CD 25 is a protected district only has a bearing on the key issue of the retrogressive impact of the enacted plan, and not the location or boundaries of any offsetting new ability district.

. The TLRTF specifically referenced turnout in the 2002 Democratic primary race for Governor; the 2006 Democratic primary for Lt. Governor; the 2008 Democratic primary race for U.S. Senator; and the 2010 Democratic primary race for Lt. Governor. TLRTF's Resp. to the Ct.’s Order of Mar. 6, 2012, ECF No. 219, at 13.

. The dissent states that Dr. Alford rejected the turnout data because he found significant discrepancies in the " 'last two columns [of the data],'” CD 25 Dissent, at 196 n. 11, while we find discrepancies in other parts, or columns, of this data, an observation that leads our colleague to conclude that “Dr. Alford’s concern is not the same as” ours. This is simply wrong. Dr. Alford pointed out blatant error rates in certain columns of the dataset merely as examples of the significant issues with relying on this data, and made clear that there were a "variety” of issues with this data. Trial Tr. 86-87, Jan. 24, 2012 PM (Alford) ("I've not relied on the analysis ... because of a variety of technical things, we don't need to discuss.”) (emphasis supplied). Thus, when our dissenting colleague "use[s] that same metric [namely, the difference between the real and projected voter turnout]— the only ground Dr. Alford gave as support for his critique — to test the data,” CD 25 Dissent, at 196 n. 11, he may be missing the remaining “variety of technical things” referenced by Dr. Alford that were not fully developed in the record by the experts and that make this data insufficiently reliable for even Texas’ own expert to rely upon.

. Notably, at no point did Texas cite to the OAG turnout data in response to the intervenors' argument that CD 25 was a protected ability district in the Benchmark Plan. The only time any party cited to this data in regards to CD 25 was in the post-trial submission filed by the TLRTF in response to a show cause order issued by the Court. See Minute Order dated Mar. 6, 2012; TLRTF’s Resp. to the Ct.’s Order of Mar. 6, 2012, EOF No. 219. Even then, the TLRTF cited to turnout data for primary elections. If the OAG’s turnout data were reliable and minority voter turnout was 10% in CD 25, CD 25 Dissent, at 195-96, the Court's inquiry into whether CD 25 is a protected district in the Benchmark plan would meet a swift end. See Majority Op., at 150-51 (noting that minority voters who make up 10% of a population and provide a margin of victory to Anglo Democratic voters could not be protected under Section 5). If the OAG turnout data had sufficient reliability to have any probative value, Texas's failure to rely on this data would be inexplicable. Rather, the explanation lies in the fact that this data is simply so unreliable as to be irrelevant.

. Our colleague states in dissent that unlike the OAG dataset criticized by Dr. Alford, the OAG dataset upon which the dissent relies appears to "accurately predict[] the overall turnout in a given election.” CD 25 Dissent, at 196 n. 11. This may be so, but the projections relevant to the Court's analysis are those pertaining to the number of votes cast by minority groups. There is no testimony, expert or otherwise, in the record that the data on which the dissent relies is not as flawed as the turnout numbers rejected by Dr. Alford. Texas’s failure to cite to this data again indicates to the Court that it has little probative value.

. Our dissenting colleague fails to acknowledge that none of the experts in this case appears to rely on OAG turnout projections. He also dismisses, without explanation, the fact that Texas — the party that compiled and calculated the turnout projections — never relied upon this data.

. For example, our colleague acknowledges that his calculation that minorities cast only 19% of the vote for Congressman Doggett is "imperfect” because "relative turnout among minority groups ... could have changed between elections.” CD 25 Dissent, at 195 n. 10. Overall turnout changed dramatically between the 2008 and 2010 elections. In 2008, 291,296 voters voted in the election for the U.S. Congress in Benchmark CD 25. PL’s Ex. 31, at 10. In 2010, voter turnout dropped over 33%, by more than 100,000 votes, to 189,247. PL’s Ex. 32, at 13. The dissent’s assumption that turnout among racial groups remained constant as a percentage of the overall voter turnout is unsupported speculation. Given the number of variables affecting voter turnout generally and the complexity of predicting turnout on a demographic basis, none of the experts in this case — including the one who compiled the data used by our colleague to compute his 19% figure — apparently viewed such predictions as sufficiently reliable to offer an opinion.

. We disagree with our dissenting colleague’s assertion that turnout data is the only way to provide a “context” for the expert testimony before the Court. CD 25 Dissent, *189 at 196 n. 11. In the absence of reliable turnout projections, unrebutted witness testimony and endogenous election results are sufficient to corroborate expert analysis and to provide a "context” for such evidence. See Texas, 831 F.Supp.2d at 268 (recognizing crossover and coalition districts may be ability districts based upon "discrete data, by way of election returns, to confirm the existence of a voting coalition's electoral power,” citing as example "evidence that a coalition had historical success in electing its candidates of choice”).

. Counsel for the Department of Justice explained as follows: "Congressional District 25 does perform ... the issues there ... has to do with polarized voting ... we aren't finding the polarized voting in that area.... [Tjhere is polarized voting in most of Texas.... The question is regarding this area around Travis County area, and the success where it’s not crossover anymore if 52 percent of the ... Anglo voters are voting the same as the [B]lack voters and the same as the Hispanic voters or whatever the percent may be depending upon which election contest you're looking at. So at a certain level again, is the protections that flow do deal with the realities of polarized voting and whether or not there exists polarized voting.” Trial Tr. 84-85, Jan. 31, 2012 AM.

. The Department does not indicate the threshold number of Anglo cross-over votes that would remove from the protection of Section 5 an otherwise minority ability district. In any event, rather than focus on the single demographic statistic of the number of Anglo cross-over votes, a functional test must be applied to assess whether minority voters effectively exercise power to elect their candidate of choice in a cross-over coalition.

. The United States' position is that the protections of Section 5 need not apply to CD 25 because of the presence of crossover Anglo voters. The presence of these crossover Anglo voters does not sufficiently protect minority voters in CD 25, but, in fact, may create a ripe target for actors in other parts of the state to retrogress minority voting power in CD 25 by fracturing the district and submerging its pieces in areas where race-based voting remains prevalent. Indeed, the enacted plan divides Travis County into five different districts and as a result, "[t]his is the only county in which the population exceeds the number required to constitute a [congressional] district, but the county is not the seat of any single district.” Ansolabehere Report on Minority and White Representation and Voting Patterns in the Texas Congressional District Plan Cl85 at 47, Perez v. Perry, Aug. 8, 2011, ECFNo. 123-1.